On redirect, McCann asked appellant, "Mr. Turner, in your mind, all that drivel was true, wasn't it?" Appellant responded, "It is true."

### In re Patrick McCANN et al.
### Nos. AP–76998, AP–76999.

Court of Criminal Appeals of Texas.

Nov. 20, 2013.

Casie Gotro, Houston, TX, Lisa C. McMinn, State's Attorney, Austin, for Relator.

## OPINION

HERVEY, J., delivered the opinion of the Court in which KELLER, P.J., MEYERS, JOHNSON, KEASLER, COCHRAN, and ALCALA, JJ., joined.

Relator, Patrick McCann, seeks writs of mandamus to overturn orders of the trial court directing him to relinquish his former client's trial file to successor counsel and holding him in contempt for his failure to do so. He also seeks a writ of prohibition to disallow the trial court from enforcing its order compelling him to turn the file over. We will conditionally grant Relator relief on his petition for writs of mandamus and dismiss his petition for a writ of prohibition.

### I. BACKGROUND

Albert James Turner was charged with capital murder. At trial, he was represented by Patrick McCann and Tyrone Moncriffe. In June 2011, Turner was found guilty and sentenced to death. The trial court appointed counsel for Turner's direct appeal and the Office of Capital Writs ("OCW") to handle Turner's postconviction writ. As part of its investigation, OCW asked Turner to authorize the release of his trial file from McCann. Turner refused to sign the release because OCW is a "state agency," [1] and he wanted to speak with his sister before moving forward. Lacking Turner's authorization, McCann refused to release the file believing that his client was invoking his right to keep his privileged information confidential.

In response, OCW filed a motion asking the trial court to order McCann to turn the

---

1. Based on the record, Turner's concern about OCW was that its employees are not paid by a political subdivision (usually counties), as are indigent-defense attorneys. He was skeptical of lawyers from OCW representing him because they are employed and paid by the State of Texas.

file over. After a hearing,[2] the trial court ordered trial counsel to relinquish Turner's trial file, and McCann refused. He then filed a motion in this Court for leave to file petitions for writs of mandamus and prohibition. While McCann's motion was pending, OCW successfully withdrew as Turner's habeas counsel. Subsequently, we dismissed McCann's motion as moot because OCW, a "state agency," no longer represented Turner. *McCann v. Elliot*, Nos. WR–76,984–01, WR–76,984–02, 2012 WL 752612 (Tex.Crim.App. Mar. 7, 2012) (per curiam) (not designated for publication).

The trial court then appointed new habeas counsel, James Rytting, to represent Turner in his postconviction application,[3] and Rytting, like OCW, sought Turner's trial file for investigatory purposes. Rytting stated that he visited Turner twice in person after his appointment, and he agreed that McCann's characterization of Turner was correct in that Turner did not want the file turned over.[4] Rytting also

explained that, based on his visits with Turner, if McCann gave the file to Turner, Rytting would never see it. For his part, McCann continued to refuse to relinquish the trial file based on his understanding of his client's wishes.[5] In a second hearing, the trial court ordered McCann to turn over his file again. After failing to comply with the trial court's second order, the court found McCann in contempt.

On January 7, 2013, this Court granted a Motion for Emergency Relief staying enforcement of the trial court's orders to turn over the file and finding McCann in contempt. *In re McCann*, No. WR–76,-984–01 (Tex.Crim.App. Jan. 7, 2013) (per curiam) (not designated for publication). We then filed and set the petitions and ordered the parties to brief the following three issues:

1. To whom does a client's physical file belong?

2. If the file belongs to the client (the defendant in the underlying case here), what are the possible consequences

---

2. At the hearing on whether Turner would sign the release, OCW asked Turner if it would make a difference if he were represented by someone unaffiliated with the State, and Turner responded that "[i]t just depends on, you know, the relationship. That would make a difference, yes, but that still wouldn't make my decision up for me." He also emphasized his need to speak with his sister, who he believed was looking for an attorney to handle Turner's postconviction writ application.

3. Initially, the trial court appointed John E. Wright, but he declined the appointment due to his employment at the Regional Public Defenders for Capital Cases in Lubbock.

4. According to an affidavit signed by Rytting on February 6, 2013, Rytting had visited Turner in person at the Polunsky Unit twice and had attempted to meet him on other occasions. He also stated that Turner accepted file-release forms from him, and Turner told Rytting that he would think about executing them.

5. McCann's understanding of Turner's wishes stem from three separate incidents. The first incident was sometime before the hearing with OCW and McCann. At that time, McCann was discussing appellate counsel with his client when, according to McCann, Turner allegedly said, "I don't trust any of y'all. I don't want you to give them anything unless I approve it. My sister's going to hire me a lawyer. You keep the file until I tell you otherwise."

Later, Turner testified at the OCW–McCann hearing, and he stated that he would not sign the release, but he also indicated that he might be willing to sign it in the future. McCann took this as a continued refusal to turn the file over, while the trial judge was of the opinion that Turner was not refusing or agreeing to turn the file over.

Finally, according to McCann, OCW asked him to write a letter to Turner about turning the file over, but whether this was before or after the hearing in which Turner testified is unclear. Nonetheless, McCann wrote the letter, but he stated that he never received a reply.

should the client refuse to turn over the file to subsequent counsel?

3. If the file belongs to the client and the client is unable or unwilling to decide whether to turn over the file, to whom does that decision fall (*e.g.* former counsel, subsequent counsel, trial judge, or guardian appointed for that issue)?

*In re McCann,* Nos. AP–76,998 & AP–76,999, 2013 WL 1149840, at *1 (Tex.Crim. App. Mar. 20, 2013) (per curiam) (not designated for publication). The Court received Rytting's court-ordered brief on April 19, 2013. McCann never submitted a brief on the merits, and the State Bar of Texas filed an amicus brief.

## II. WRITS OF MANDAMUS AND PROHIBITION

■■■ Mandamus relief may be granted if a relator shows that: (1) the act sought to be compelled is purely ministerial, and (2) there is no adequate remedy at law. *In re State ex rel. Weeks,* 391 S.W.3d 117, 121–22 (Tex.Crim.App.2013). With respect to the requirement that the act sought is purely ministerial, the relator must have a "clear right to the relief sought," meaning that the merits of the relief sought are "beyond dispute." *See Winters v. Presiding Judge of Criminal Dist. Court No. Three of Tarrant Cnty.,* 118 S.W.3d 773, 775–76 (Tex.Crim.App. 2003). To show "a clear right to the relief sought," a relator must show that the facts and circumstances of the case "dictate but one rational decision 'under unequivocal, well-settled . . . and clearly controlling legal principles.' " *Weeks,* 391 S.W.3d at 122. However, we have also noted that, although an issue may be one of first impression, it does not necessarily follow that

the law is not well-settled. *Id.* It is a small step then to hold that, this Court may grant relief in a mandamus case based on a well-settled, but rarely litigated point of law. *See id.* Regarding the requirement of an adequate remedy at law, we have held that even if a relator has a remedy at law, that relator can show that no *adequate* legal remedy exists at law if the remedy is "so uncertain, tedious, burdensome, slow, inconvenient, inappropriate, or ineffective as to be deemed inadequate" *Id.* (quoting *Greenwell v. Court of Appeals for the Thirteenth Judicial Dist.,* 159 S.W.3d 645, 648–49 (Tex.Crim.App. 2005)).

■■■ Similarly, prohibition relief is available only if the relator shows that he has a clear right to the relief sought and no other adequate legal remedy is available. *See State ex rel. Lykos v. Fine,* 330 S.W.3d 904, 907 (Tex.Crim.App.2011). In an ordinary case, a petition for writ of mandamus "should first be presented to a court of appeals unless there is a compelling reason not to do so." *Padilla v. McDaniel,* 122 S.W.3d 805, 807–08 (Tex. Crim.App.2003) (per curiam) (citing TEX. R.APP. P. 52.3(e)). However, the mandamus action was properly filed directly in this Court because this is a capital-murder case in which the death penalty was assessed. *See Padilla,* 122 S.W.3d at 806–07.

## III. DISCUSSION

■■■ To whom does a client's file belong? The client's file belongs to the client.[6] In 1918, the Texas Supreme Court recognized explicitly that an attorney is an

---

6. There is a split among courts that have considered this question. *See generally* Brian J. Slovut, Note, *Eliminating Conflict at the Termination of the Attorney–Client Relationship: A Proposed Standard Governing Property Rights in the Client's File,* 76 MINN. L.REV. 1483 (1992). Many jurisdictions follow the

entire-file standard. That is, the client owns all of the documents within the client's file. Thus, a lawyer must relinquish the entire contents of the client's file upon request (assuming that there is no valid attorney lien). On the other hand, other jurisdictions follow the end-product standard that divides ownership

agent of his client and implicitly that a client owns the contents of his or her file. *See Thomson v. Findlater Hardware Co.,* 109 Tex. 235, 237, 205 S.W. 831, 832 (Tex. 1918). Later, we expressly reaffirmed that a client owns the contents of his or her file.[7] *See Burnett v. State,* 642 S.W.2d 765, 769, n. 10 (Tex.Crim.App.1983) (citing *Thomson,* 205 S.W. at 832) ("[W]hen all is said and done, the tape recording, as with deeds, notes, vouchers, documents and papers of a client, is the property of [the client]"). Neither McCann nor the State has referred to our holding in *Burnett,* but the amicus curiae brief filed by the State Bar of Texas cites *Burnett* for the true, but inapplicable, proposition that the right

to claim or waive the attorney-client privilege belongs to the client, his guardian, or his conservator. Amended Brief of Amicus Curiae State Bar of Texas, Nos. AP–76,998 & AP–76,999, at 6–7; *see Burnett,* 642 S.W.2d at 770. Today we reaffirm that a client owns the contents of his or her file. Rytting advances a bevy of arguments as to why a client's file, or part of a client's file, does not belong to the client, and to support his arguments, he cites a number of sources. However, as we explain, each of Rytting's arguments is unpersuasive.[8]

First, Rytting argues that Texas Disciplinary Rule of Professional Conduct

---

between the client and the attorney. *Id.* at 1485.

7. In *Burnett,* the appellant, on direct appeal from her death sentence, argued that the trial court erred when it admitted into evidence a recorded pre-hypnotic interview between the appellant and a hypnotist hired by her attorneys. *Burnett,* 642 S.W.2d at 766–67. Before resolving the second question presented for our review—whether the attorney-client privilege prevented the admission of the tape into evidence—we first resolved the question of who owned the physical tape. In our analysis, we noted that the parties made "various characterizations" of the recording, including that the admission of the tape violated the appellant's attorney-client privilege, the work product of counsel, or the property rights of the hypnotist. However, we held that the recording, "as with deeds, notes, vouchers, documents and papers of a client," belong to the client. We reached this holding due to the hypnotist's agency relationship with the appellant's attorneys who were in turn the appellant's agents. We also held that admission of the tape was error because the attorney-client privilege applied to exclude the tape from evidence. *Id.* at 769–70. However, because Turner's file has not been offered into evidence in this case, as the pre-hypnotic tape was in *Burnett,* today we need not address the privilege issue because it is not ripe for our review.

8. *See, e.g., In re George,* 28 S.W.3d 511, 516 (Tex.2000) (citing TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.15) (noting that "[t]he attorney is the agent of the client, and the

work product generated by the attorney in representing the client belongs to the client"); *Resolution Trust Corp. v. H——, P.C.,* 128 F.R.D. 647, 648 (N.D.Tex.1989) (mem.op.) (holding that, under Texas law, the entire contents of a client's file belong to the client and the argument that "only another lawyer can be trusted with the file.... cannot be taken seriously...." because that practice "is contrary to the fiduciary and agency nature of the relationship between a client and an attorney."); TEX. DISCIPLINARY RULES PROF'L CONDUCT; RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS (2000); GUIDELINES AND STANDARDS FOR TEXAS CAPITAL COUNSEL (State Bar of Tex.2006); GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (2003); TEX. COMM. ON PROF'L ETHICS, Ops. 395 (1979) (noting that an attorney who refuses to turn over a client's file is at risk of liability, even if asserting an attorney lien, because that attorney's actions may subsequently be deemed unethical and sanctionable), 411 (1984) (same), 570 (2006) ("A lawyer must, upon request, provide to a former client the notes of the lawyer from the lawyer's file for that former client except when the lawyer has the right to withhold the notes pursuant to a legal right such as a lawyer's lien, when the lawyer is required to withhold the lawyer's notes (or portions thereof) by court order, or when not withholding the notes (or portions thereof) would violate a duty owed to a third person or risk causing serious harm to the client."); *see also Smith v. State,* 523 S.W.2d 1, 6 (Tex.Civ.App.–Corpus Christi 1975, writ ref'd n.r.e.) (sustaining disciplinary sanctions when an attorney claimed to assert an attor-

1.15(d) [9] limits a client's interest in his or her own file to a possessory right to demand a copy of the file, and even that right is qualified, he asserts, because an attorney is allowed to withhold a client's papers to enforce payment of fees in the form of an attorney lien. TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.15(d), *reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G, app. A (Tex. State Bar R. art. X, § 9). These arguments—that the client has a limited possessory interest in his or her own file and that the attorney-lien language of the Disciplinary Rules creates a property right in favor of the attorney— are not persuasive. First, Rule 1.15(d) of the Texas Disciplinary Rules of Professional Conduct speaks to only "papers and property to which the client is entitled . . . [,]" and it contemplates the retention of client papers only in the case of a valid attorney lien, which has not been asserted here. Second, Rytting's attorney-lien argument is a red herring and actually supports Relator's position. The language of Rule 1.15(d) allows an attorney to retain papers "relating to the client" as allowed by law, if such retention does not prejudice the client in the subject matter of the representation. *Id.* The language of the rule does not designate the owner of the "papers relating to the client"; rather it allows an attorney to assert an attorney lien on those papers. A lien is a "legal right or interest that a creditor has *in another's property*" that usually lasts "until a debt or duty that it secures is satisfied." BLACK'S LAW DICTIONARY 933 (7th ed.1999) (emphasis added). Thus, a lien, by its definition, is a transitory interest in someone else's property and, therefore, the attorney asserting such a lien never owns the property at issue, the client owns the file by implication (if the attorney does not), and Rytting's arguments must fail.[10] Next, Rytting eschews property-right arguments in favor of asserting that ethical and professional duties require a trial attorney to retain *a copy* of the trial file for the benefit of subsequent counsel in a death-penalty case.[11] Specifically, Rytting cites Guideline 11.8 of the State Bar of Texas's Guidelines and Standards for Texas Capital Counsel and Guideline 10.13 of the American Bar Association's Guide for the Appointment and Performance of Defense Counsel in Death Penalty Cases. The two guidelines are substantially simi-

ney lien in good faith on certain client files but was subsequently found by a unanimous jury to have withheld the file in bad faith).

9.  Section (d) of Rule 1.15 states,

    Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payments of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law if such retention will not prejudice the client in the subject matter of the representation.

    TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.15(d).

10. We also note that, to perfect an attorney lien, the attorney must possess the papers he or she purports to have a lien on to receive payment for services rendered. *See Thomson*, 205 S.W. at 832 (holding that, to perfect an attorney lien, there are two requirements: (1) the property must actually be in the possession of the attorney, and (2) the property must have come into the possession of the attorney in his or her character as an attorney at law). However, this case has been brought specifically to prevent Rytting from obtaining Turner's trial file; thus, it is impossible for Rytting to perfect an attorney lien under these facts.

11. We address Rytting's argument only to the extent that it would require trial counsel to keep a copy of a client's file for the future use of successor counsel despite the client's wishes to the contrary.

lar.[12] *Compare* GUIDELINES AND STANDARDS FOR TEXAS CAPITAL COUNSEL 11.8 (State Bar of Tex.2006), *with* ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES 10.13 (2003). Rytting, however, neglects to cite Guideline 12.1(F) of the Texas guidelines expressly limiting the ability of trial counsel to turn over a client's file to successor counsel without the consent of the client.[13] Nonetheless, both guidelines are only persuasive authority, and they are designed to safeguard a criminal-defendant's interests, not a successor counsel's "right" to force trial counsel to retain, and turn over, a client's file (or a copy) against the client's wishes. Thus, if the client makes a voluntary decision not to turn over his or her file, a client's former counsel is obligated to refuse to provide a copy of the client's file to facilitate the work of successor counsel. This is because the agent (the client's former attorney) may not relinquish dominion and control of the principal's property without the principal's permission absent circumstances inapplicable in this case (e.g., an attorney lien, incompetency).[14] This is true even if the client

12. According to these guidelines, the duty to facilitate the work of successor counsel includes (1) maintaining the records of the case in a manner that will inform successor counsel of all significant developments relevant to the litigation, (2) providing the client's file, as well as information regarding all aspects of the representation, to successor counsel, (3) sharing potential further areas of legal and factual research with successor counsel, and (4) cooperating with such professionally appropriate legal strategies as may be chosen by successor counsel.

13. Section F of Guideline 12.1, "Duties of Trial Counsel After Conviction[,]" states the following:

Trial counsel should cooperate with successor direct appeal, habeas and clemency counsel in providing relevant information to successor counsel, including trial counsel's prior representation files *upon the client's consent,* in order to maintain continuity of representation, and to assist future counsel in presentation of issues relevant to subsequent litigation efforts.

GUIDELINES AND STANDARDS FOR TEXAS CAPITAL COUNSEL 12.1(F) (State Bar of Tex.2006) (emphasis added).

14. RESTATEMENT (THIRD) OF AGENCY § 8.09 ("An agent has a duty to comply with all lawful instructions received from the principal and persons designated by the principal concerning the agent's actions on behalf of the principal."); *see Gen. Motors Acceptance Corp./Crenshaw, Dupree & Milam, L.L.P. v. Crenshaw, Dupree & Milam, L.L.P./General Motors Acceptance Corp.,* 986 S.W.2d 632, 636 (Tex.App.–El Paso 1998, pet ref'd) (citing *Cooper v. Lee,* 75 Tex. 114, 12 S.W. 483, 486 (1889)) (holding that a "fiduciary relationship exists between attorneys and clients as a matter of law" and that "an agent must obey the lawful directions of its principal").

While McCann's obligation not to relinquish Turner's trial file may have also stemmed from his duty of confidentiality under the disciplinary rules, there is a more fundamental reason, why McCann was obligated not to release Turner's trial file: because Turner owns the contents of his file, and the trial court attempted to require McCann to violate the instructions of his client and principal to whom he has a fiduciary duty. *See In re George,* 28 S.W.3d at 516 (characterizing the attorney-client relationship as one of principal and agent); *Resolution Trust Corp.,* 128 F.R.D. at 648 (stating that the argument that "only another lawyer can be trusted with the file.... cannot be taken seriously...." because that practice "is contrary to the fiduciary and agency nature of the relationship between a client and an attorney"); *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 199–200 (Tex.2002) ("Our courts have long recognized that certain fiduciary duties are owed by ... an attorney to a client.") (footnotes omitted); *see also* RESTATEMENT (THIRD) OF AGENCY §§ 8.01, 8.05 (characterizing the principal-agent relationship as a fiduciary one, and stating that an agent specifically "has a duty (1) not to use property of the principal for the agent's own purposes or those of a third party; and (2) not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party"); TEX. DISCIPLINARY

decides, against his or her best interests, not to relinquish the trial file to subsequent counsel because a legally competent client can define his or her own best interests, and that decision will control.[15] Finally, Rytting argues that if a client is unable or unwilling to decide if it is in his or her best interest to release the trial file to successor counsel, then that decision lies with successor counsel as the "current attorney" for the client and not former counsel or a guardian. However, the authorities cited by Rytting regarding attorney-client privilege are inapposite because, as we have explained, property rights control the outcome of this question, not privilege law or the Texas Disciplinary Rules of Professional Conduct.[16]

If an attorney has no reason to believe that his or her client is legally incompetent, the client's decision not to release his or her trial file is unassailable. However, if the attorney "reasonably believes that the client lacks legal competence[,]" then the attorney "shall take reasonable action to secure the appointment of a guardian or other legal representative...." [17] Tex. Disciplinary Rules Prof'l Conduct R. 1.02(g).

Rules Prof'l Conduct R. 1.5 & cmt. (the comment states, in part, that "[b]oth the fiduciary relationship existing between lawyer and client and the proper functioning of the legal system require the preservation by the lawyer of confidential information of one who has employed ... the lawyer"). The outcome in this case may have been different if Turner had been found incompetent (a question we do not answer today) and if, during the period of his incompetency, a guardian was appointed to make decisions in Turner's best interest, including turning over his trial file to successor counsel despite Turner's protestations to the contrary.

15. This comports with the agency entire-file approach followed in Texas (i.e., all of the contents of a client's file belong to the client). *See supra* note 6. Also, an attorney is required to vigorously advocate for his or her client's best interests, which can be defined by the client, although that attorney may believe that his or her strategy will result in a better outcome for the client. However, a client's ability to define his or her own best interests may end when an attorney's duty under Rule 1.02(g) of the Texas Disciplinary Rules of Professional Conduct begins—when an attorney reasonably believes that the client's ability to make decisions in his or her best interest is compromised, the appointment of a guardian should be sought.

16. For example, the relevant passage from the Restatement (Third) on the Law Governing Lawyers states, "If a former lawyer with whom the client made a privileged exchange and a lawyer now representing the client disagree on whether to assert the privilege, as between them the current lawyer-agent determines whether to assert or waive the privi-

lege." Restatement (Third) on the Law Governing Lawyers § 86, rpt. cmt. c (2003). The quoted passage merely contemplates who should prevail in a disagreement between a client's former and current attorney. It does not state that a client's current attorney can assert the privilege against the client's objections. Rytting also cites Weinstein's Federal Evidence and Federal Practice and Procedure for the same proposition, but as we have explained, that proposition is not persuasive under these circumstances.

17. Although competency has not been directly raised in this proceeding, the competency of Turner was raised numerous times by McCann at trial. At the January 4, hearing regarding turning over of the file, the following exchange took place:

[RYTTING]: So you don't believe Mr. Turner has made an intelligent decision about turning over the files, therefore authorizing me to get your files?

[McCANN]: I'm not a psychologist. I did my best to sit there and bring forth the fact that I believe that he suffers from something that prevents him from making capable decisions, but that was not the decision of the Court, and in fairness to the Court, during the hearings we had, the psychological testimony, although voluminous, was fairly gray on several topics because [Turner] refused to talk to the psychologist that we sent to him, including Dr. Almeida.

Later in the same hearing, McCann testified that "I'm placed in a catch–22. I have a client who's invoking the privilege, who is still legally competent, and I can't turn that over, even in the face of a court order...." Rytting asked McCann what his basis was for concluding that Turner is currently legally

If a guardian or other legal representative has already been appointed, the client's attorney "should ordinarily look to that representative for decisions on behalf of the client." *Id.* at 1.02(g) cmts. 12 & 13. Nevertheless, an attorney can seek to have an appointed guardian replaced if he or she is not acting in the best interest of the client. *See Urbish v. 127th Judicial Dist. Ct.,* 708 S.W.2d 429, 431–32 (Tex.1986) (orig.proceeding) (holding that, when considering only the ward's best interests, a trial court can replace a guardian if it determines that the guardian has an adverse interest to the ward; the decision of the trial court is reviewed for an abuse of discretion). Thus, Rytting's argument that successor counsel's decision regarding his or her client's file prevails over all other claims, including those of his competent client or the client's guardian (if applicable) is unsupportable and an incorrect statement of the law.

In this case, the conflict is between Turner's trial and postconviction attorneys. McCann, Turner's trial attorney, has declined to turn over the file based on his understanding that his former client wants him to hold the file until otherwise directed. Rytting, Turner's postconviction attorney, seeks to force McCann to turn over the file because he believes that it is in his client's best interests. Both attorneys have obligations under the Texas Disciplinary Rules of Professional Conduct: McCann is obliged to honor his former

client's wishes not to reveal privileged information, and Rytting seeks to overturn his appointed client's sentence of death in postconviction proceedings but is being prevented by his own client from effectively doing so.[18] McCann, however, has an additional burden based on the binding precedent of this Court under *Burnett,* and as the agent and holder of his principal's trial file, to follow the wishes of his principal in disposing or retaining the property as the principal directs.[19] Assuming Turner is legally competent (as the trial court found in this case), he is entitled to choose not to turn over his trial file; and McCann, as Turner's former counsel and agent, must honor that decision for the reasons that we have explained. If, however, McCann, Rytting, or another interested party with standing believes that Turner is legally incompetent, that person can seek to have a guardian appointed.

Although the trial judge rejected repeated motions by McCann to have Turner declared incompetent pretrial and at trial, it may be in the client's best interests for Rytting to also attempt to have a guardian appointed. But we acknowledge that, before the appointment of a guardian is warranted, a defendant must do more than simply misbehave; he or she must be proven legally incompetent by a preponderance of the evidence.[20] *See* Tex.Code Crim. Proc. art. 46B.003(b). Moreover, the trial judge is correct that certain deadlines have been triggered in this death-penalty

---

competent, and McCann responded that "the Court has found him competent. Given that, his invocation of privilege is proper." We agree that McCann is in a precarious position given that Turner, thus far, has been ruled competent and refuses to release his trial file.

**18.** In an affidavit authored by Rytting, he agreed that Turner would not relinquish his trial file, and the record shows that Turner refused to sign the release (i.e., the functional equivalent of refusing to turn over the file). Unless Turner signs the release or a guardian is appointed, Rytting is bound by Turner's decision, or indecision, as the case may be.

**19.** *See supra* note 14.

**20.** While we are sympathetic to the plight of Rytting as the postconviction attorney for a client who refuses to assist his own attorney, we decline to abdicate our duty under our mandamus jurisprudence by allowing a trial court to "save" a capital defendant from his "own manifest paranoias" when a trial court has found the defendant competent, and the defendant chooses not to release his trial file. *See* Dissenting Op. at 720. Moreover, it is entirely unclear how this Court could justify creating, or applying, an unheard of and totally unsupported exception to our mandamus

case that cause Turner's decision to severely damage his chances of success in postconviction proceedings,[21] but if Turner is competent to stand trial, then his choice to undermine the ability of his postconviction attorney to represent him effectively may be a poor one, but it is one the law allows him to make.

## IV. RELATOR IS ENTITLED TO RELIEF

Here, Turner is statutorily presumed competent, and he has expressly been found competent by the trial court. Moreover, his last. instructions to McCann were not to release his trial file unless directed to do so. After Turner told McCann to not release his trial file, he declined repeatedly to sign a release authorizing his trial file to be turned over to his appointed postconviction counsel despite his knowl-

edge of the consequences of such an action.

Therefore, in light of this opinion—a client owns his or her trial file and a former attorney is obligated to follow his or her former client's last known wishes under these circumstances—McCann should not turn over his former client's file, Judge Elliott did not have the authority (inherent or otherwise) to order McCann to violate his fiduciary duty to Turner,[22] and Judge Elliott did not have the authority to enforce that order by holding McCann in contempt for failing to relinquish the file. Moreover, McCann has no adequate remedy at law because, although McCann could seek relief from the order of contempt through an application for writ of habeas corpus,[23] that relief would not resolve the underlying issue of

---

jurisprudence allowing a trial court in a capital case to "save" a defendant who suffers from "his own manifest paranoias." Furthermore, there is no clear limiting principle for such an exception. For example, would this exception properly apply to only mandamus proceedings, only cases in which the death penalty was assessed, or all cases in which a defendant suffers from his or her own manifest paranoias but is not incompetent? Also, it is not clear who would determine whether a defendant suffers from "manifest paranoias" or what the standard of review for such a conclusion would be.

21. In a death-penalty case, appellate timelines are of the· utmost importance for at least two reasons. First, when the death penalty is assessed, a criminal defendant's interest in zealous representation is at its peak. Second, filing deadlines in capital felony cases are different than in other cases. The Texas Constitution and the Texas Code of Criminal Procedure state that capital cases in which the death penalty is assessed are appealed directly to the Court of Criminal Appeals. TEX. CONST. art. V, § 5(b); TEX.CODE CRIM. PROC. art. 37.071(h). In addition, Section 4(a) of Article 11.071 of the Texas Code of Criminal Procedure states that an application for a writ of habeas corpus must be filed "not later than the 180th day after the date the convicting court appoints counsel ... or not later than

the 45th day after the date the state's original brief is filed on direct appeal with the court of criminal appeals, whichever date is later." TEX.CODE CRIM. PROC. art. 11.071, § 4(a) (dealing with applications for writs of habeas corpus in capital cases in which the death penalty was assessed).

22. *See Stearnes v. Clinton*, 780 S.W.2d 216, 223 (Tex.Crim.App.1989) (orig.proceeding) (granting conditional mandamus relief). In *Stearnes*, we held that a trial court that acts without inherent power acts without authority, and that a relator satisfies "the first prerequisite for mandamus relief" when he or she shows that a trial court acted without authority. *Id.* Furthermore, under Section 21.001 of the Texas Government Code, "[a] court has all powers necessary for the exercise of its jurisdiction and the enforcement of its lawful orders, including authority to issue the ... orders necessary or proper in aid of its jurisdiction." TEX. GOV'T CODE § 21.001(a). Neither order issued by the trial judge in this case was issued to enforce its jurisdiction, and we have not been directed to, nor are we aware of, any inherent or explicit authority authorizing the trial court to enter such orders.

23. *Ex parte Thompson*, 273 S.W.3d 177, 181 (Tex.Crim.App.2008) (holding that the Court

the trial judge's order compelling McCann to relinquish Turner's trial file. In addition, Rytting points to no constitutional provision, statute, or caselaw, nor are we aware of any, that allows McCann to appeal the order of the trial judge compelling him to turn over the trial file. *See Johnson v. Tenth Judicial Dist. Ct. of Appeals at Waco,* 280 S.W.3d 866, 873 (Tex.Crim. App.2008). Thus, even if McCann has a remedy at law, it is not adequate under these circumstances.

In addition, because McCann has a clear right to relief, vacating the order of contempt and the order to relinquish Turner's trial file is a purely ministerial act. Therefore, we conditionally grant Relator relief on his petition for writs of mandamus. We assume that the trial court will immediately comply with our order, and the writs of mandamus will issue only in the event that the judge should refuse to do so.[24]

PRICE, J., filed a dissenting opinion.

WOMACK, J., dissented.

PRICE, J., filed a dissenting opinion.

Today the Court holds that, as between a lawyer and his client, the client owns the legal file that is in his lawyer's possession; that the client may dictate the disposition of that file; and that the client's dictates override the express order of a sitting judge. I wholly agree with the Court that "[t]he client's file belongs to the client."[1] But I disagree that this holding suffices to dispose of the mandamus proceeding before us. In my view, the Court asks the wrong question. The right question—the answer to which will properly dispose of the case before us—is whether, *given that* the file "belongs to the client," the convicting court presiding over this capital habeas corpus proceeding lacks all authority to order a disposition of that client's file that is at odds with the client's wishes. In my view, there is no clear answer to that question to be derived from any state precedent.

The Court effectively disposes of the question of the convicting court's authority by summarily declaring that Judge Elliott "did not have the authority (inherent or otherwise) to order McCann to violate his fiduciary duty to Turner[.]"[2] The only precedent the Court is able to muster in support of this declaration, however, simply establishes that a trial court's authority extends only to the issuance of "lawful" orders.[3] But, of course, the very question that the Court effectively begs is whether the convicting court's order compelling McCann to turn over his client's file against his client's wishes was, indeed, "lawful." If the Court must take this occasion to say what the law is for the first time, I fail to understand how it can be said that the law up until now was so "clear" that McCann is entitled to mandamus relief from the convicting court's contempt order. For that reason, I believe that mandamus relief should not lie.

## McCann's Dilemma: "A Lawyer Shall Not . . . Reveal Confidential Information"[4]

An attorney's duty to maintain his client's confidences arises from his ethical

of Criminal Appeal's original jurisdiction for writs of habeas corpus under the Texas Constitution allows it to review orders of contempt entered by district courts); *see* Tex. Const. art. V, § 5(c); 13 Tex. Jur.3d *Contempt* § 69 (2011).

**24.** We dismiss McCann's petition for writ of prohibition. *See Weeks,* 391 S.W.3d at 126 n. 43.

1. Majority Opinion at 704–05.

2. *Id.* at 710–11.

3. *Id.* at 710 n. 22.

4. *See* Tex. Disciplinary Rules Prof'l Conduct R. 1.05(b)(1) ("[A] lawyer shall not knowingly . . . [r]eveal confidential information of a client or former client to . . . a person that the

obligations as a practitioner of the profession of lawyering.[5] Both McCann and Rytting are attempting to satisfy what they perceive to be their respective ethical duties, but face the vexing dilemma that those duties cannot simultaneously be satisfied. McCann, for his part, feels that he is bound by his ethical duty to maintain client confidences not to divulge confidential information over the wishes of his client. Rytting feels that he is bound by his ethical duty of effective representation to seek trial counsel's files—whether they contain confidential information or not—and examine them for purposes of preparing an application for writ of habeas corpus. Both lawyers, realizing the ethical quandary they are in, have laid their concerns at the feet of the convicting court and asked for a ruling so that one or the other of them may be absolved of any ethical wrongdoing. What the Court essentially declares today is that the law unequivocally binds Judge Elliott to resolve this ethical quandary in McCann's favor. I disagree.

The bulk of the Court's analysis is devoted to answering the following question: "To whom does a client's file belong?"

The Court relies, *inter alia,* on the Texas Supreme Court's opinion in *In re George* to conclude that a client "owns the contents of his or her file."[6] I do not disagree with this conclusion. But *George* itself recognizes that, a client's ownership of his file notwithstanding, a "compelling reason" may justify "depriv[ing] a client of his or her property."[7] Indeed, in *George,* the Texas Supreme Court did not question the trial court's ultimate authority to order disclosure, but rather sought to describe the circumstances when, and the extent to which, it would be appropriate to *exercise* that authority.[8] Thus, simply to say that the file belongs to Turner, and that Turner, if he is competent,[9] may do what he wishes with the file, does not answer the *determinative* question in this case, which is: *Given that* the client owns the contents of his case file, does a convicting court lack all authority to issue an order disposing of the file in a way that conflicts with the client's expressed wishes? This question is anything but well-settled.

To the extent that the Court relies on ethical considerations to reach its ultimate conclusion, there is good reason to think that the answer to this question is: No, the authority of trial judges is *not* limited in this way. Professors Goode, Wellborn,

client has instructed is not to receive the information[.]").

5. *See* Tex. Disciplinary Rules Prof'l Conduct preamble ¶ 1 ("A lawyer is a representative of clients, an officer of the legal system and a public citizen having special responsibility for the quality of justice.... A consequent obligation of lawyers is to maintain the highest standards of ethical conduct.").

6. *Id.* at 704–05 & n. 8 (citing *In re George,* 28 S.W.3d 511, 516 (Tex.2000)).

7. *George,* 28 S.W.3d at 516.

8. *Id.* at 515–16 ("Once they determine that a restriction [on disclosure] is necessary because an attorney has been disqualified for a

prior, substantially related representation, some courts do not inquire into the work product itself. They automatically forbid any work product from being transferred [over the client's wishes] to the successor attorney ... This approach may be appropriate for cases in which the entire suit is based on improperly revealed confidential information ... But we believe that it is inappropriate for a general rule.").

9. My concerns about the Court's conclusion are not dependent upon, nor do they stem from, any issues relating to Turner's present competency. To the contrary, *irrespective of* Turner's mental capacity to make decisions affecting his post-conviction pursuit of relief, my concerns relate only to what I perceive to be the unsettled state of the law.

and Sharlot have concluded that "[t]he rules of professional conduct do not ... provide an independent basis for refusing to answer questions during the course of a ... criminal proceeding."[10] That treatise also notes that "the attorney-client privilege empowers a client to block the *compelled* disclosure of confidential attorney-client communications ... [while] the ethical obligation enjoins the lawyer from *voluntarily* revealing confidential information obtained while representing the client."[11] The distinction, in that discussion, between "compelled" and "voluntary" disclosures serves to highlight an important aspect of this case: McCann is not citing the Rules of Professional Conduct for the proposition that he is ethically prohibited from *voluntarily* turning over Turner's files. Were he to make such an argument, I would be inclined to agree with him. Rather, McCann is citing to the Rules of Professional Conduct for the proposition that the trial judge *has no authority to compel* McCann to turn the files over to Rytting, nor even to order him to make a copy and turn that over. And this is where I think

McCann's (and, by extension, the Court's) argument ultimately falters.

The Texas Disciplinary Rules of Professional Conduct *explicitly* envision that there will be occasions when a lawyer will face conflicting obligations from, on the one hand, a court order, and, on the other, the Rules themselves. Rule 1.05(c)(4), for instance, states that "[a] lawyer may reveal confidential information ... [w]hen the lawyer has reason to believe it is necessary to do so in order to comply with a *court order* [.]"[12] We have not, either today or at any other time that I am aware of, explained what effect, if any, this provision has on the authority of a trial judge to resolve an ethical Catch–22 such as the one presented in this case.[13] True enough, the Rule states that a lawyer "may reveal," not that he "must reveal." But this simply means that one who voluntarily disobeys a court order to turn over confidential material does not violate *the Disciplinary Rules of Professional Conduct*—it does not mean that he does not violate the court order, that the order is of no effect, or that the Rules altogether strip the court of the authority to issue that order. This conclu-

**10.** Steven Goode, Olin Guy Wellborn III, & M. Michael Sharlot, 1 TEXAS PRACTICE: GUIDE TO THE TEXAS RULES OF EVIDENCE § 503.3, at 411 (3d ed.2002).

**11.** *Id.* (emphasis added). The explanation in a previous edition was even more to-the-point: "Protection against *non-compelled* disclosure of a client's confidential communications to his attorney comes from the Texas Disciplinary Rules of Professional Conduct." Steven Goode, Olin Guy Wellborn III, & M. Michael Sharlot, 1 TEXAS PRACTICE: GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 503.2, at 327 (2d ed.1993) (emphasis added). *See also* Robert A. Pikowsky, *Privilege and Confidentiality of Attorney–Client Communication Via E-mail*, 51 BAYLOR L.REV. 483, 490–91 (1999) ("Of course, a professional who is called to testify in judicial proceedings cannot lawfully refuse to do so based exclusively on a duty of confidentiality in the absence of any recognized privilege. Unless a

privilege exists as well, the court can properly require the professional's testimony."); Mitchell M. Simon, *Discreet Disclosures: Should Lawyers Who Disclose Confidential Information to Protect Third Parties Be Compelled to Testify Against Their Clients?*, 49 S. TEX. L.REV. 307, 315 (2007) ("The key difference between confidentiality, which governs a lawyer's *voluntary* actions, and privilege is that *privilege* trumps a court's authority to compel testimony.") (emphasis added).

**12.** TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.05(c)(4) (emphasis added).

**13.** *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.05 cmt. 22 ("[A] lawyer may be obligated by other provisions of statutes or other law to give information about a client. *Whether another provision of law supersedes Rule 1.05 is a matter of interpretation beyond the scope of these Rules.*") (emphasis added).

sion is especially apparent when Rule 1.05 is considered in light of other provisions of the Texas Disciplinary Rules of Professional Conduct that make clear that the Rules govern *the profession of lawyering*—not the authority of trial judges—and *by their terms* purport to extend no further.[14]

Moreover, to the extent that the Court relies on property-law considerations in reaching its ultimate conclusion, again there is reason to think that the answer to (what I have called) the determinative question in this case would also cut against a grant of mandamus relief to McCann—that is, that property law *by itself* does not limit the authority of trial judges in the way envisaged by the Court. In coming to the conclusion that McCann's "burden based on the binding precedent . . . under *Burnett*" is sufficiently weighty to render Judge Elliott's order unenforceable, the Court purports only to reaffirm our holding in Burnett that "a client owns the contents of his or her file."[15] From there, the Court (correctly) recognizes that the assertion of the attorney-client privilege is not implicated in this case and then (incorrectly) surmises that the second holding of *Burnett* can be disregarded.

To the contrary, I find it significant that *Burnett's* first holding—according to the

Court, that the client owns the contents of his or her file—did not dispose of the relevant issue in that case. Indeed, the fact that the *Burnett* Court saw the need to discuss the law of privilege *after* determining ownership of the file indicates to me that property-rights considerations were, to say the least, insufficient by themselves to illuminate the proper disposition of that case. After all, if the proposition that a competent client can exercise "unassailable" ownership of his or her file were as true in *Burnett* as it seemingly is today,[16] why bother, in that case, to discuss the attorney-client privilege *at all?*

The reason, of course, is that a party's assertion of a property right, without more, does not—and *should not*—solely determine the extent of a trial judge's authority in these circumstances. In both *Burnett* and *George,* the litigants seeking to avoid respective court orders commanding them to dispose of their "property" in a certain fashion were expected to assert, in addition to their property interests, *something else*—some other definite legal protection or right that actually limited the authority of the trial judge. In *Burnett* this "something else" was the attorney-client privilege.[17] In *George* the "something else" was the threat of an actual conflict of interest.[18] In this case I see no

---

**14.** *See, e.g.,* Tex. Disciplinary Rules Prof'l Conduct preamble ¶¶ 11–16 ("The[se] rules presuppose a larger legal context . . . [which] includes court rules and statutes relating to matters of . . . laws defining specific obligations of lawyers and substantive and procedural law in general. [* * *] These rules make no attempt to prescribe either disciplinary procedures or penalties for violation of a rule. [* * *] Violation of a rule . . . does [not] create any presumption that a legal duty to a client has been breached . . . The fact that a rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of disciplinary authority, *does not imply that an antagonist in a collateral proceeding . . . has standing to seek enforcement of the rule. Accordingly, nothing in the*

*rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty.* [* * *] Moreover, these rules are not intended to govern or affect judicial application of either the attorney-client or work product privilege.") (emphasis added).

**15.** Majority Opinion at 704–05 & n. 7, 709–10 & n. 19.

**16.** *See id.* at 709.

**17.** 642 S.W.2d at 769.

**18.** 28 S.W.3d at 512 (citing Tex. Disciplinary Rules Prof'l Conduct R. 1.09(a)).

"something else"—I see only a bare assertion of a property right, and absolutely *no* argument as to how this property right is so inviolable as to be totally impervious to court order.[19]

Even if I have misread *Burnett* and *George,* I would remain of the opinion that property law alone gives no "clear" or "settled" resolution to the case before us. There are still, in my mind, too many unanswered questions to admit of a such a clear resolution. For instance: The Court addresses at length the wrongfulness of Judge Elliott's order to McCann to turn over his client's *physical* file, but curiously glosses over whether it would have been wrong, *per* Rytting's explicit request, to simply order McCann to relinquish a *copy* of the file. How do we know whether such an order would *also* violate Turner's property rights (that is, which authorities provide a "clear" answer to *this* question)? Is it because the file is just a physical embodiment of what is, in effect, Turner's *intellectual* property? How do we know? If Turner has an intellectual property interest in the contents of the file, how far does that interest extend? All the way? Less than all the way? How do we know? Does making a copy of the file and handing the copy to the client's current attor-

ney violate that interest, whatever its extent? How do we know?

Again, I do not claim to have answers to these questions. I am simply pointing out that the Court's disposition *depends upon,* or at the very least suggests, the pre-existence of clear and definitive answers. Today the Court says for the first time what the law *is* in this area, but then treats its pronouncement as time-honored and long-established. Trial judges who find themselves the subject of our mandamus authority can only scratch their heads.

### Rytting's Dilemma: "A Lawyer Zealously Asserts the Client's Position" [20]

There was a time in our jurisprudence when this Court—and others—recognized the "discretionary" nature of mandamus relief.[21] This discretion, it was thought, existed even when the long-settled prerequisites for mandamus—a clear claim to relief and the absence of an adequate remedy at law—had been met.[22] Perhaps it was in view of this discretion that the Court ordered the parties in this case to brief a question that, on its face, appears not to be grounded in the law as much as

19. It could be argued, I suppose, that Turner's property interest works in tandem with McCann's "fiduciary duty," Majority Opinion at 707–08 & n. 14, to place limits on the trial court's authority to order a relinquishment of Turner's property. But again, the fact that McCann has an ethical duty to his client does not necessarily imply that Judge Elliott has a clear legal duty to rule in favor of McCann. And I do not understand how the aggregation of one arguably authority-limiting consideration (property rights) with one arguably *non-*authority-limiting consideration (fiduciary duty) results in a *decidedly* authority-limiting consideration that is somehow greater than the sum of its parts.

20. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT preamble ¶ 2 ("As advocate, a lawyer zealous-

ly asserts the client's position under the rules of the adversary system.").

21. *See* George E. Dix and John M. Schmolesky, 43B TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 61:3, at 930 (3d ed.2011) (citing *Dickens v. Court of Appeals for Second Supreme Judicial District of Texas,* 727 S.W.2d 542, 549 (Tex.Crim.App.1987) ("Mandamus is an extraordinary writ, and is not issued as a matter of right, but rests largely in the sound discretion of the Court.") (citation omitted); *Lanford v. Fourteenth Court of Appeals,* 847 S.W.2d 581, 585 (Tex.Crim.App.1993) ("[M]andamus is a drastic remedy, to be invoked only in extraordinary situations.") (alteration in original) (citation omitted)).

22. *Id.*

the potential ramifications of Turner's own self-defeating decision: "If the file belongs to the client (the defendant in the underlying case here), what are the possible consequences should the client refuse to turn over the file to subsequent counsel?" [23]

In its haste to find error in Judge Elliott's decision to override McCann's refusal to turn over Turner's file to Rytting, the Court fixates on the duties and dilemmas facing *McCann* in his own decision whether to turn over Turner's files, but wastes no ink to consider the dilemma faced by Rytting. The Court today does not even mention the "possible consequences" to Turner, notwithstanding the interest it evinced in its earlier briefing order. Again, given the "discretionary" nature of mandamus relief and the fact that mandamus is available only in "extraordinary situations," [24] I am puzzled by the Court's reticence in this regard. Whatever the reason, since the Court has not undertaken to describe the consequences to Rytting and Turner should Judge Elliott's order be overturned, I will.

Rytting has an obligation—an ethical imperative—to review McCann's files on Turner for any signs of ineffective representation at the trial level. This obligation is apparent from a perusal through the admittedly nebulous and lofty expectations of the Disciplinary Rules of Professional Conduct:

> Lawyers, as guardians of the law, play a vital role in the preservation of society. As advisor, a lawyer provides a client with an informed understanding of the client's legal rights and obligations and explains their practical implications. *As advocate, a lawyer zealously asserts the client's position under the rules of the adversary system.* A lawyer acts as evaluator by examining a client's affairs and reporting about them to the client or to others. In all professional functions, a lawyer should zealously pursue clients' interests within the bounds of the law. In doing so, a lawyer should be competent, prompt, and diligent. [P]ersonal involvement in the problems of the disadvantaged can be one of the most rewarding experiences in the life of a lawyer. In representing a client, a lawyer shall not ... neglect a matter entrusted to the lawyer[.] *Competent representation contemplates ... reasonable thoroughness in the study and analysis of the law and facts,* and reasonable attentiveness to the responsibilities owed to the client. A lawyer should feel a moral or professional obligation to pursue a matter on behalf of a client with reasonable diligence and promptness despite opposition, obstruction or personal inconvenience to the lawyer. [A] lawyer shall abide by a client's decisions ... concerning the objectives and general methods of representation, [but] [*t*] *he lawyer should assume responsibility for the means by which the client's objectives are best achieved. Thus, a lawyer has very broad discretion to determine technical and legal tactics* [.] The advocate has a duty to use legal procedure for the fullest benefit of the client's cause[.] The advocate's task is to present the client's case with persuasive force.[25]

23. *In re McCann*, Nos. AP–76,998 & AP–76,999, 2013 WL 1149840, at *1 (Tex.Crim.App. Mar. 20, 2013) (per curiam) (not designated for publication).

24. George E. Dix and John M. Schmolesky, 43B Texas Practice: Criminal Practice and Procedure § 61:3, at 930 (3d ed.2011).

25. Tex. Disciplinary Rules Prof'l Conduct preamble ¶¶ 1–3, 6, R. 1.01(b)(1) & cmt. 1, 6, R. 1.02(a)(1) & cmt. 1, R. 3.01 cmt. 1, R. 3.03 cmt. 1 (emphasis added and some ellipses omitted throughout).

It is also apparent from a close study of the more concrete expectations of the Guidelines and Standards for Texas Capital Counsel:

The objective of these Guidelines is to set forth a state-wide standard of practice for the defense of capital cases in order to ensure high quality legal representation for all persons facing the possible imposition or execution of a death sentence by any State of Texas jurisdiction. *Counsel at every stage have an obligation to conduct a full examination of the defense provided to the client at all prior phases of the case.* This obligation includes at a minimum interviewing prior counsel and members of the defense team and examining the files of prior counsel. Counsel at every stage of the case, exercising professional judgment in accordance with these Guidelines, should [c]onsider all legal claims potentially available; and [*t*]*horoughly investigate the basis for each potential claim before reaching a conclusion as to whether it should be asserted;* and [e]valuate each potential claim in light of ... [t]he importance of protecting the client's right against later contentions by the government that the claim has been waived, defaulted, not exhausted, or otherwise forfeited. Counsel who decide to assert a particular legal claim should [p]resent the claim as forcefully as possible, tailoring the presentation to the particular facts and circumstances in the client's case and the applicable law. Habeas corpus counsel must understand that the state habeas corpus proceeding is not a second direct appeal. Direct appeal-like, record-based claims are not cognizable in state habeas corpus and can be fatal to the capital client. Counsel should not accept an appointment if he or she is not prepared to undertake the comprehensive extra-record investigation that habeas corpus requires. [H]abeas counsel cannot rely on the work of, or representations made by, prior counsel to limit the scope of the post-conviction investigation. [*C*]*ounsel has a duty to conduct a searching inquiry to assess whether any constitutional violations may have taken place, including ... ineffective assistance of trial ... counsel.* State habeas corpus counsel's lack of diligence, mistakes, missteps, and omissions will be attributed to the capital client and will follow the client throughout all remaining proceedings in state and federal court. It is a dereliction of habeas corpus counsel's duty to simply acquiesce to a capital client's insistence that he or she ... wants to challenge only the conviction but not the sentence. Counsel must also inspect the evidence and obtain the files of trial and appellate counsel, scrutinizing them for what is missing as well as what is present. *Habeas corpus counsel must demand on behalf of the capital client all resources necessary to provide high quality legal representation,* to conduct a thorough investigation of both the conviction and sentence, to procure documentary evidence, and to retain experts. Habeas corpus counsel should consider every legal claim potentially available, and thoroughly investigate the basis for each potential claim[.] [26]

These are the expectations—the *obligations*—confronting Rytting as he seeks access to McCann's files on Turner.

And this is the reality he faces: Investigating a client's case beyond merely reading the direct appellate record—and reviewing trial counsel's case files *in particular*—is an indispensable first step in

---

**26.** Guidelines and Standards for Texas Capital Counsel 1.1(A), 11.1(B), 11.2(A), 11.2(B)(1), 12.2(B)(1)(b), 12.2(B)(2)(c), 12.2(B)(3)(b), 12.2(B)(6)(a), 12.2(B)(7)(b) (State Bar of Tex. 2006) (emphases added and some ellipses omitted throughout).

proving ineffective assistance of counsel at the trial level. This is because "[a] substantial risk of failure accompanies an appellant's claim of ineffective assistance of counsel on [a] direct appe[llate] ... record."[27] On an appellate record, this Court will presume that "[trial] counsel's conduct fell within the wide range of reasonable professional assistance"—and in order to overcome this "strong presumption," a claimant must "affirmatively demonstrate the alleged ineffectiveness" *in the appellate record.*[28] But "[t]he record in a direct appeal may well contain a less than adequate inquiry into possible tactical reasons for various actions or omissions by counsel and may lack completely trial counsel's own explanations for his actions or inactions."[29] Indeed, one of the crucial purposes of habeas corpus proceedings is to *supplement* the appellate record so as to *demonstrate* trial counsel's ineffectiveness—in a way that the appellate record standing by itself typically will not. And while it might be said that Rytting could simply depose, seek affidavits from, or otherwise interview McCann to get the information he needs to prove ineffectiveness outside the direct appellate record, the Guidelines specifically state that "habeas counsel cannot rely on the work of, or representations made by, prior counsel to limit the scope of the post-conviction investigation."[30] To do so, in other words, would be to compromise an ethical duty.[31]

Even beyond filling in the important details of ineffectiveness claims that are hinted at within—but not apparent from—the record,[32] habeas counsel's review of

**27.** See *Thompson v. State,* 9 S.W.3d 808, 813 (Tex.Crim.App.1999).

**28.** *Id.* at 813–14.

**29.** *Id.* at 814 n. 5 (citing George E. Dix and Robert O. Dawson, 41 Texas Practice: Criminal Practice and Procedure § 24.94 (2d ed.1995)).

**30.** Guidelines and Standards for Texas Capital Counsel 12.2(B)(1)(b) (State Bar of Tex.2006).

**31.** Indeed, it is arguable that Rytting is ethically bound to at least investigate a claim of ineffective assistance *even against his client's expressed wishes. Cf. Summerlin v. Schriro,* 427 F.3d 623, 638–39 (9th Cir.2005) ("[A] lawyer's duty to investigate [mitigation issues] is virtually absolute, regardless of a client's expressed wishes ... [E]ven when faced with client directives limiting the scope of defense, an attorney must conduct a reasonable investigation enabling him to make informed decisions about how best to represent his client.") (internal quotation marks omitted) (quoting *Silva v. Woodford,* 279 F.3d 825, 838–46 (9th Cir.2002)); *Harries v. Bell,* 417 F.3d 631, 638 (6th Cir.2005) ("[A] 'defendant['s] resistance to disclosure of information does not excuse counsel's duty to independently investigate.' ") (quoting *Coleman v. Mitchell,* 268 F.3d 417, 449–50 (6th Cir.2001)); *Thompson v. Wainwright,* 787 F.2d 1447, 1451 (11th Cir.1986) ("[A] lawyer[ ] may not 'blindly follow' [the client's] commands [because] although the decision whether to use [mitigation] evidence in court is for the client ... the lawyer first must evaluate potential avenues and advise the client of those offering possible merit.") (quoting *Foster v. Strickland,* 707 F.2d 1339, 1343 (11th Cir.1983)). In any event, this Court has yet to hold otherwise. And the ineffectiveness of trial counsel is, to say the least, an extremely important claim to make, as evidenced by the fact that it is one of the most often-litigated claims in a writ application. *See* Gary Udashen, *Designating and Determining Issues on An Applications for Writ of Habeas Corpus,* Texas Center for the Judiciary 2009 Writs Training Conference at 6 (2009).

**32.** For example, at the October 7, 2011 OCW–McCann hearing, the following exchange took place between Turner and counsel for McCann:

> [Counsel for McCann:] Do you think that Mr. McCann did a good job in your trial?
> [Mr. Turner:] (Shakes head negatively).
> [Counsel for McCann:] Is that a no?
> [Mr. Turner:] (No response).
> [Counsel for McCann:] You can say it. It's okay. You're not going to hurt anybody's feelings.
> [Mr. Turner:] No.

trial counsel's files serves other important purposes in the preparation of an initial application for state habeas corpus relief. It can reveal whole swaths of a client's circumstances that, were they simply not presented at trial, this Court might presume were left out for strategic purposes, but upon review of the file in its *entirety* would be more properly characterized as instances of trial counsel's neglect or poor judgment—and potentially his ineffectiveness.[33] Habeas counsel's review of trial counsel's files can, in addition, serve to aid the investigation of claims *unrelated* to trial counsel's ineffectiveness. It can serve, for example, as a starting point for looking into whether the State possesses undisclosed exculpatory evidence,[34] or whether evidence exists that might establish the client's actual innocence.[35] Moreover, such a review can assist counsel to separate specious claims of all kinds from those with potential merit. In short, reviewing trial counsel's files provides an array of advantages to initial state habeas corpus counsel by aiding him in his considerable investigatory task *in addition to* providing substance and depth to claims that might not otherwise stand a chance at succeeding.

So should the Court overturn Judge Elliott's order today, Turner may have to submit his initial state habeas application—which will set the tone of his entire post-conviction pursuit of relief—with claims of the ineffectiveness of trial counsel that lack meaningful substantiation. Being purely record-based, these claims

would probably fail to "allege[ ]facts that, if true, might entitle him to relief."[36] If this is the case, he will most likely be denied an evidentiary hearing to develop the facts—since he has been unable to *allege* concrete facts.[37] Instead, he will limp into federal court with what little fact-development he could muster from his investigation *sans* trial counsel's files, and this meager federal review will avail him little, if anything. And at the end of it all, Turner may very well be executed without ever having a genuine shot at proving that his trial counsel's assistance was deficient.

Judge Elliott believed it possible to resolve McCann and Rytting's ethical dilemma, and at the same time assure Turner the "competent counsel" that Article 11.071 envisions,[38] by granting Rytting access to Turner's files. Perhaps his decision was overly paternalistic. Perhaps it was ill-advised. Perhaps it was even arguably incorrect as a matter of law (although I doubt it). Nevertheless, I am unwilling to subject a trial judge to the stigma of mandamus for a decision that was merely *arguably* incorrect. Mandamus is only appropriate when a relator's claim for relief is "clear"—not arguable—and a claim for relief can only be "clear" when the law undergirding the claim is "well-settled."[39] I think that the law in this area is demonstrably unsettled; at the very least it is *insufficiently* well settled to justify the extraordinary measure of mandamus. And even if I were wrong in this regard, I would think it inappropriate to exercise

33. *See, e.g., Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

34. *See, e.g., Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

35. *See, e.g., Ex parte Elizondo,* 947 S.W.2d 202 (Tex.Crim.App.1996).

36. *See Ex parte Medina,* 361 S.W.3d 633, 638 n. 10 (Tex.Crim.App.2011).

37. *Id.* at 637–38 (where a habeas applicant makes conclusory allegations in his initial writ application, even remanding to the trial court for further factual development is inappropriate).

38. Tex.Code Crim. Proc. art. 11.071, § 2.

39. *In re State ex rel. Weeks,* 391 S.W.3d 117, 122 (Tex.Crim.App.2013).

our discretion so as to prevent a trial judge from saving a capital habeas applicant—even one who has not been declared incompetent—from his own manifest paranoias. I respectfully dissent.