PD-0119-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 2/16/2015 3:19:50 PM
Accepted 2/18/2015 8:45:31 AM
ABEL ACOSTA
CLERK

No. PD-0119-15

IN THE COURT OF CRIMINAL APPEALS
FOR THE STATE OF TEXAS

JESUS GONZALEZ
*Appellant*

v.

THE STATE OF TEXAS
*Appellee*

On Petition for Discretionary Review from the First Court of Appeals in
No. 01-12-01115-CR, affirming the conviction in cause number 1307888
From the 177th District Court of Harris County, Texas

APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

ORAL ARGUMENT REQUESTED

FILED IN
COURT OF CRIMINAL APPEALS

February 18, 2015

ABEL ACOSTA, CLERK

ALEXANDER BUNIN
Public Defender
Harris County, Texas

MARK KRATOVIL
Assistant Public Defender
Texas Bar Number 24076098
1201 Franklin Street, 13th Floor
Houston, Texas 77002
Telephone: (713) 274-6728
Facsimile: (713) 437-4339
mark.kratovil@pdo.hctx.net

**Counsel for Appellant**

## IDENTITY OF PARTIES AND COUNSEL

| | |
|---|---|
| APPELLANT | Jesus Gonzalez<br>TDCJ # 01827388<br>Polunsky Unit<br>3872 FM 350<br>Livingston, Texas 77351 |
| DEFENSE COUNSEL AT TRIAL | Paul Decuir<br>P.O. Box 9687<br>Houston, Texas 77213 |
| PROSECUTOR AT TRIAL | Adam Muldrow<br>Assistant District Attorney |
| | Hans Nielsen<br>Assistant District Attorney<br>Harris County, Texas<br>1201 Franklin Street<br>Houston, Texas 77002 |
| PROSECUTOR ON MOTION FOR NEW TRIAL | Mia Magness<br>Assistant District Attorney<br>Harris County, Texas<br>1201 Franklin Street<br>Houston, Texas 77002 |
| PRESIDING JUDGE | The Honorable Ryan Patrick<br>177th District Court<br>1201 Franklin Street, 19th Floor<br>Houston, Texas 77002 |
| PROSECUTOR ON APPEAL | Jessica Akins<br>Assistant District Attorney<br>Harris County, Texas<br>1201 Franklin Street<br>Houston, Texas 77002 |
| APPELLANT'S COUNSEL ON MOTION FOR NEW TRIAL AND ON APPEAL | Mark Kratovil<br>Assistant Public Defender<br>Harris County, Texas<br>1201 Franklin Street, 13th Floor<br>Houston, Texas 77002 |

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL.................................................................................. ii

TABLE OF CONTENTS .......................................................................................................... iii

INDEX OF AUTHORITIES ..................................................................................................... iv

STATEMENT REGARDING ORAL ARGUMENT .................................................................. 1

STATEMENT OF THE CASE ................................................................................................... 1

STATEMENT OF THE PROCEDURAL HISTORY ................................................................ 3

GROUND FOR REVIEW ......................................................................................................... 4

REASON FOR REVIEW .......................................................................................................... 4

STATEMENT OF FACTS......................................................................................................... 4

ARGUMENT ............................................................................................................................. 7

    A. Case Law and the Texas Disciplinary Rules of Professional Conduct Definitively Establish That Trial Counsel's File Belongs to the Appellant.......................... 7

    B. Trial Counsel Cannot Refuse to Produce the File By claiming Attorney-Client Privilege ......................................................................................................................... 9

    C. This Court Has the Authority to Order a Supplemental Hearing Without Vacating the Appellant's Conviction ......................................................................... 10

PRAYER FOR RELIEF ........................................................................................................... 11

CERTIFICATE OF SERVICE................................................................................................. 12

CERTIFICATE OF COMPLIANCE ...................................................................................... 13

APPENDIX A .......................................................................................................................... 14

APPENDIX B .......................................................................................................................... 16

# INDEX OF AUTHORITIES

**Cases**

*Burnett v. State*, 642 S.W.2d 765 (Tex. Crim. App. 1982) ...................................................... 9

*Cook v. State*, 390 S.W.3d 363 (Tex. Crim. App. 2013) ..................................................... 10

*Gonzalez v. State*, 2014 WL 7205145, No. 01-12-01115-CR (Tex. App.—Houston [1st Dist.] 2014) (not designated for publication) ........................................................ 3, 7

*Joseph v. State*, 3 S.W.3d 627 (Tex. App.—Houston [14th Dist.] 1999, no pet.) ............. 9

*Laughner v. United States*, 373 F.2d 326 (5th Cir. 1967) ................................................... 9

*In re McCann*, 422 S.W.3d 701 (Tex. Crim. App. 2013) ........................................ 1, 4, 8, 9

*Reyes v. State*, 82 S.W.3d 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.) .............. 10

**Statutes**

Tex. R. App. Proc. 43.2 (West 2014) ............................................................................. 10

Tex. R. App. Proc. 43.6 (West 2014) ............................................................................. 10

Tex. R. App. Proc. 66.3 (West 2014) ............................................................................... 4

**Secondary Sources**

Tex. Discliplinary R. Prof'l Conduct 1.15 (2011) ........................................................ 7, 8

iv

## STATEMENT REGARDING ORAL ARGUMENT

Because the issue presented in this Petition for Discretionary Review involves the application of relatively new precedent from this Court,[1] the Appellant believes that the opportunity to present oral argument would aid the Court in rendering a decision.

## STATEMENT OF THE CASE

The Harris County District Attorney's Office charged Jesus Gonzalez ("Appellant") by indictment with one count of murder. Specifically, the Appellant was alleged to have caused the death of Alicia Gonzalez by stabbing her with a knife. No enhancement paragraphs were alleged in the indictment. (C.R. at 12)

Voir dire began on November 20, 2012, and a jury was seated that same day. (2 R.R. at 119-120). The Appellant was subsequently convicted of murder on December 4, 2012. (4 R.R. at 55-56; C.R. at 94) Punishment proceedings began the same day, with the Appellant electing to have a jury assess punishment. (C.R. at 102) The jury assessed a punishment verdict sentencing the Appellant to fifty (50) years confinement in the Texas Department of Criminal Justice. (5 R.R. at 25; C.R. at 102). The Appellant's notice of appeal was certified by the trial court on December 5, 2012. (C.R. at 108-109).

---

[1] Specifically, the issue presented revolves around this Court's decision in *In re McCann*, 422 S.W.3d 701 (Tex. Crim. App. 2013).

A Motion for New Trial was filed by appellate counsel on January 4, 2013, requesting only a new punishment hearing and asserting three grounds for the requested relief: 1) ineffective assistance of counsel at the punishment phase; 2) that the trial court committed error in refusing to submit a sudden passion jury instruction at the punishment phase; 3) and that a new trial should be granted in the interests of justice. (Special C.R. at 2-13).[2] Twelve supporting affidavits from friends and family members of the Appellant were attached to the Motion for New Trial. (Special C.R. at 18-62).

On January 9, 2013, Judge Ryan Patrick denied the Motion for New Trial without conducting an evidentiary hearing. (Supplemental C.R. at 2, 15). The Appellant filed a Motion to Abate with the First Court of Appeals asserting that the trial court abused its discretion in denying the Motion for New Trial without first conducting an evidentiary hearing. This Motion to Abate was granted by the First Court of Appeals and the trial court was ordered to conduct an evidentiary hearing. (Supplemental C.R. at 3-14). After the conclusion of a live hearing on the Appellant's Motion for New Trial, the trial court again denied the motion on July 24, 2013. (Supplemental C.R. at 15).

---

[2] There are two additional Clerk's Records in the present case. First, there is a "Special Clerk's Record" which was filed with the Court of Appeals on April 2, 2013 and contains the Appellant's Motion for New Trial and supporting affidavits. Second, there is a "Supplemental Clerk's Record" which contains the abatement order from the Court of Appeals and the trial court's ultimate ruling denying the Motion for New Trial. For purposes of clarity, references to these Clerks' Records will specifically refer to each as either the "Special" or "Supplemental" Clerk's Record.

## STATEMENT OF THE PROCEDURAL HISTORY

The First Court of Appeals issued a unanimous, unpublished memorandum opinion affirming the Appellant's conviction on December 18, 2014. Justice Jennings authored the opinion. In its opinion, the First Court of Appeals held that the Appellant's ineffective assistance of counsel claim failed to satisfy the prejudice prong of *Strickland*. *Gonzalez v. State*, 2014 WL 7205145 at *11, No. 01-12-01115-CR (Tex. App.—Houston [1st Dist.] 2014) (not designated for publication). In a footnote, the First Court of Appeals declined to abate the case for a supplemental hearing regarding trial counsel's refusal and failure to surrender trial counsel's file to appellate counsel. *Id.* at fn. 4. No motion for rehearing was filed.

## GROUND FOR REVIEW

The First Court of Appeals erred in failing to order a supplemental hearing in the trial court where trial counsel for the defense would have been ordered to produce and surrender his trial file for inspection by appellate counsel, as trial counsel previously ignored a subpoena to produce the file and refused to abide by his former client's wishes to have the file surrendered to appellate counsel.

## REASON FOR REVIEW

The First Court of Appeals has decided an issue which conflicts with an applicable decision of this Court. *See* Tex. R. App. Proc. 66.3(c). Specifically, this Court reaffirmed the longstanding rule in *In re McCann*, 422 S.W.3d 701 (Tex. Crim. App. 2013) ("a client owns his or her trial file and a former attorney is obligated to follow his or her former client's last known wishes under these circumstances"), that a client's file belongs to a client. Trial counsel in the present case refused to surrender the Appellant's file to appellate counsel, despite the Appellant's unambiguous order to do so. In footnote four of its opinion, the First Court of Appeals briefly addressed this issue and declined to order trial counsel to surrender the file in a supplemental hearing. This aspect of the opinion of the First Court of Appeals is in conflict with this Court's precedent as stated in *In re McCann*.

## STATEMENT OF FACTS

There is no question that the Appellant committed the crime he was charged with. The Appellant confessed to murdering his wife—the complainant—and no

4

cognizable defense was presented at trial. (3 R.R. at 79-81, 92; 7 R.R. at 9; State's Exhibit 2; State's Exhibit 5). The facts of the case, as presented by the First Court of Appeals, are largely accurate and the Appellant takes no issue with the lower court's recitation of them. However, for purposes of this Petition for Discretionary Review, the underlying facts of the case have no bearing on the legal issue at play.

The issue at the center of this appeal was the conduct of trial counsel in preparing for trial and at the punishment phase of the Appellant's trial, where the defense presented neither witnesses nor any mitigation case. At the hearing on the Appellant's Motion for New Trial, trial counsel for the Appellant testified. Trial counsel acknowledged that he had received and signed a subpoena requesting that he produce the file he had created cataloging his actions in preparing for the Appellant's trial. However, trial counsel ignored the commands of this subpoena and failed to bring any documentation with him to the first day of the Motion for New Trial hearing. (2 R.R. (M.N.T.) at 34-35).

At the second day of the Motion for New Trial hearing, trial counsel brought with him an item which he represented was the Appellant's trial file, although he acknowledged that he did not bring other items concerning the Appellant's case which would have substantiated many of the claims trial counsel made during his testimony. Trial counsel explained his actions thusly: "I did bring the trial file. I didn't bring the investigation file because Lisa Jones has it and she is in Indiana at this time and she was last week with her daughter who is having some difficulty in pregnancy,

5

but I brought the trial file with me." (3 R.R. (M.N.T.) at 4). In explaining his reticence to surrender the Appellant's file to appellate counsel, trial counsel explained that he feared his former client would file a grievance against him should he turn over the file. According to trial counsel, "You know, I'm reluctant to turn the file over to them unless the Court orders me to turn it over because Mr. Gonzalez can come back and file a grievance on me and then I would have all kind of problems with the State Bar." (3 R.R. (M.N.T.) at 5).

After appellate counsel repeatedly asserted that the case file was a critical component of the Appellant's ineffectiveness claim and requesting that the trial court order trial counsel to allow appellate counsel to inspect it, the trial court ordered trial counsel to allow the trial court to conduct an ex parte investigation of relevant portions of the file's contents: "Mr. Decuir, what I'm going to ask you to do is to go through your file. If there are any documents you have that relate specifically to any witnesses, to punishment witnesses, anything that you – that's memorialized in writing as regarding punishment, if you would put those to the side, if any exist; and then when I get back I will review those and then I'll rule at that point." (3 R.R. (M.N.T.) at 39-40).

Following a break in proceedings, the trial court stated the following: "Mr. Decuir just provided me with a document from his file pertaining to some names of some potential punishment witnesses; and based on so far Mr. Decuir's testimony and what he's presented to me, the Court, from his file, I don't see anything at this point

that would require turning his file to counsel at this time." (3 R.R. (M.N.T.) at 40). Once again, appellate counsel objected and stated to the trial court that the file is the "property of the client and that it should be turned over in its entirety to present counsel." (3 R.R. (M.N.T.) at 40-41). In addition, appellate counsel noted that he had the Appellant sign a written instruction consenting to have trial counsel turn over the file to appellate counsel. This instruction was subsequently filed with the court's clerk. (3 R.R. (M.N.T.) at 40-42).[3] Nevertheless, the trial court stated that the request for trial counsel to turn over the case file would be denied. (3 R.R. (M.N.T.) at 41).

In its opinion, the First Court of Appeals acknowledged in a footnote that the Appellant had incorporated trial counsel's failure to surrender the Appellant's file into his ineffective assistance of counsel claim and requested a supplemental hearing before the trial court as an alternative ground for relief. *See Gonzalez*, 2014 WL 7205145 at *11 fn. 4. Without analyzing the merits of this claim, the First Court of Appeals held that it would not order such a hearing. *Id.*

## ARGUMENT

### A. Case Law and the Texas Disciplinary Rules of Professional Conduct Definitively Establish That Trial Counsel's File Belongs to the Appellant

It is a well-established principle that the file belongs to the client. This rule has been enshrined in the Texas Disciplinary Rules of Professional Conduct in Rule

---

[3]A copy of this Instruction to Provide Entire File is attached to this Petition for Discretionary Review as Appendix A.

7

1.15(d), which establishes that "Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as . . . surrendering papers and property to which the client is entitled[.]" The lawyer may retain papers relating to the client to the extent permitted by other law only if such retention will not prejudice the client in the subject matter of the representation." Standing on its own, this rule would demonstrated that the Appellant was entitled to have trial counsel surrender any and all files relating to his case to appellate counsel. However, this rule does not need to stand on its own, as this Court has recently reaffirmed the sanctity of this principle.

Recently in the case of *In re McCann*, 422 S.W.3d 701 (Tex. Crim. App. 2013), this Court addressed the question of who owns a case file in the possession of prior counsel when that prior counsel refuses to turn over the contents of that file. The facts of that case are similar to the present case, in that the trial attorney declined to turn over the client's file to appellate counsel. Appellate counsel sought to compel the trial attorney to turn over the file. However, in that case, the trial attorney's refusal to turn the file over was based on the trial attorney's "understanding that his former client wants him to hold the file until otherwise directed." *Id.* at 709. In resolving this question, this Court held that the file belongs to the client and that the attorney in possession of the file must abide by the client's wishes. "Assuming Turner [the defendant] is legally competent (as the trial court found in this case), he is entitled to choose not to turn over his trial file; and McCann [the trial attorney], as Turner's

former counsel and agent, must honor that decision for the reasons that we have explained." *Id.*

Although *In re McCann* had not yet been decided at the time of the Appellant's Motion for New Trial hearing, the principle that the client owns the contents of the file was already well established in Texas. In *Burnett v. State*, 642 S.W.2d 765 (Tex. Crim. App. 1982), the case upon which this Court heavily relied upon in deciding *In re McCann*, the Court stated that the contents of the file, such as recordings "deeds, notes, vouchers, documents and papers of a client, is the property of appellant." *Burnett*, 642 S.W.2d at 769. Further, this Court affirmed that the power to waive the attorney-client privilege belongs solely to the client. *Id.* at 770.

## B. Trial Counsel Cannot Refuse to Produce the File By Claiming Attorney-Client Privilege

Even without the instruction to turn over the file, the Appellant effectively waived any attorney-client privilege that trial counsel was apparently asserting by raising the ineffective assistance claim. *See, e.g., Laughner v. United States*, 373 F.2d 326 (5th Cir. 1967) ("The privilege is not an inviolable seal upon the attorney's lops. It may be waived by the client; and where, as here, the client alleges a breach of duty to him by the attorney, we have not the slightest scruple about deciding that he thereby waives the privilege as to all communication relevant to that issue."); *Joseph v. State*, 3 S.W.3d 627, 637 (Tex. App.—Houston [14th Dist.] 1999, no pet.) ("It is well settled that a client waives the attorney-client privilege when litigating a claim against his attorney for

a breach of legal duty."). If trial counsel's stated fear of having a complainant filed against him with the State Bar by the Appellant, (3 R.R. (M.N.T.) at 5), is generously read as an assertion of the attorney-client privilege, then his claim holds no merit.

## C. This Court Has the Authority to Order a Supplemental Hearing Without Vacating the Appellant's Conviction

This Court has the authority under Texas Rules of Appellate Procedure 43.2(d) to vacate the trial court's judgment and remand this case for further proceedings. However, under *Cook v. State*, 390 S.W.3d 363 (Tex. Crim. App. 2013), an appellate court may not vacate a jury's sentence for an error which occurs after a proper verdict has been rendered. *Id.* at 372-373. Because the error committed by the trial court in not commanding trial counsel to turn over his client's file occurred following a verdict and at a hearing on the Appellant's Motion for New Trial, *Cook* appears to be applicable and would bar reversal and remand on this ground alone. Therefore, this Court has the power to abate the appeal and order a supplemental hearing on the Appellant's Motion for New Trial under Texas Rules of Appellate Procedure 43.6, permitting the issuance of "any other appropriate order that the law and the nature of the case require." *See Reyes v. State*, 82 S.W.3d 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.).

## PRAYER FOR RELIEF

For the reasons stated above, the Appellant prays that this Court grant his petition, and determine whether the First Court of Appeals erred in holding that the Appellant is not entitled to a supplemental hearing to inspect the contents of trial counsel's file.

Respectfully submitted,

**ALEXANDER BUNIN**
Chief Public Defender
Harris County, Texas


   /s Mark Kratovil    
**MARK KRATOVIL**
Assistant Public Defender
Texas Bar Number 24076098
1201 Franklin Street, 13th Floor
Houston, Texas 77002
Telephone:  (713) 274-6728
Facsimile:    (713) 437-4339
mark.kratovil@pdo.hctx.net

11

## CERTIFICATE OF SERVICE

I certify that I provided a copy of the foregoing brief to the Harris County District Attorney's Appellate Division by electronic service on February 16, 2015. A copy has been sent by electronic delivery to the State Prosecuting Attorney, also on February 16, 2015.

   /s Mark Kratovil    

**MARK KRATOVIL**

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 9.4(i)(3), undersigned counsel certifies that this brief complies with the type-volume limitations of Tex. R. App. Proc. 9.4(e)(i).

1.　Exclusive of the portions exempted by Tex. R. App. Proc. 9.4 (i)(1), this brief contains **2,540** words printed in a proportionally spaced typeface.

2.　This brief is printed in a proportionally spaced typeface using Garamond 14 point font in text and Garamond 12 point font in footnotes.

3.　Upon request, undersigned counsel will provide an electronic version of this brief and/or a copy of the word printout to the Court.

4.　Undersigned counsel understands that a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in Tex. R. App. Proc. 9.4(j), may result in the Court's striking this brief and imposing sanctions against the person who signed it.

　　　　　　　　　　　　　　　/s Mark Kratovil
　　　　　　　　　　　　　　**MARK KRATOVIL**

# APPENDIX A

# Instruction to Provide Entire File

No. 1307888¾

| STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| VS. | § | 177ᵗʰ JUDICIAL DISTRICT |
| | § | |
| JESUS GOZALEZ | § | HARRIS COUNTY, TEXAS |

## INSTRUCTION TO PROVIDE ENTIRE FILE

I, JESUS GONZALEZ, hereby instruct my former attorney, Paul DeCuir, to give my entire file and all documentation regarding my case and all work performed on my case, to my current attorney, Mark Kratovil, and the Harris County Public Defender's Office so that they can work on my behalf.

FILED
Chris Daniel
District Clerk

JUL 2 4 2013

Time: ___ _____
Harris County, Texas
By _____ _____
Deputy

_Jesus Gonzalez_                 7-24-13
Jesus Gozalez                        Date

# APPENDIX B

*Jesus Gonzalez v. State of Texas*, 2014 WL 7205145, No. 01-12-01115-CR (Tex. App.— Houston [1st App.] 2014) (not designated for publication).

2014 WL 7205145
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

MEMORANDUM OPINION
DO NOT PUBLISH. TEX.R.APP. P. 47.2(B).
Court of Appeals of Texas,
Houston (1st Dist.

Jesus Gonzalez, Appellant

v.

The State of Texas, Appellee

NO. 01–12–01115–CR   |
Opinion issued December 18, 2014

**On Appeal from the 177th District Court, Harris County, Texas, Trial Court Case No. 1307888**

**Attorneys and Law Firms**

Mark Kratovil, for Jesus Gonzalez.

Patricia Rae R. Lykos, Alan Curry, Jessica Akins, for State of Texas.

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.

**MEMORANDUM OPINION**

Terry Jennings, Justice

**\*1** A jury found appellant, Jesus Gonzalez, guilty of the offense of murder [1] and assessed his punishment at confinement for fifty years. In his sole issue, appellant contends that he received ineffective assistance of counsel during the punishment phase of trial.

We affirm.

**Background**

Houston Police Department ("HPD") Officer N. Tovar testified that on May 26, 2011, he was dispatched to a "cutting in progress" at a residence. When Tovar arrived at the scene,

appellant "came out from the side driveway ... with his hands up" and appeared to have blood on his shirt. Tovar's partner took appellant into custody. Family members told Tovar that appellant and Alicia Gonzalez, his wife and the complainant, "were having a dispute and ... the grandmother tried to intervene but couldn't .... [T]hey were just arguing and [appellant] pulled a knife and ... stabbed [the complainant] a few times."

HPD Officer R. de la Cruz testified that on May 26, 2011, he was also dispatched to the "cutting in progress" and arrived shortly after Officer Tovar. He proceeded into the house, where he saw "an older lady, the mother of the [complainant]," and three children with "blood on them." He also saw "an open door leading to a bedroom and ... [the complainant] laying next to a bed with her throat cut."

HPD Homicide Officer E. Castaneda testified that upon arriving at the Gonzalez residence, he observed "blood on the tile" and the complainant in the back bedroom, deceased. Castaneda explained,

> [y]ou could tell that there was a struggle there in the bedroom. The victim was ... sitting on the floor with her back up against the bed. There was just a large amount of blood on the floor, a large amount of blood on the bed. You could tell there was a lot of blood splatter against the wall, against the back wall. It was a very violent scene.

Two knives were located in a dresser drawer; one of which had blood on it.

HPD Homicide Officer J. Sosa testified that he interviewed the complainant's mother following the incident. According to Sosa,

> [s]he was very upset. She practically witnessed the incident .... [S]he heard her daughter crying or yelling for help ... [and] she immediately [got] out of her bedroom and r[an] towards ... [the complainant and appellant's] bedroom, and she [saw appellant] attacking [the complainant]. She jump[ed] on his back to pull him off of [the complainant] and that's

> when [appellant] sliced or trie[d] to
> slice one of her arms.

The complainant's mother saw appellant stab the complainant multiple times. When he dropped the knives, the complainant's mother put them in the dresser drawer. Sosa also interviewed appellant, who admitted to having stabbed the complainant with kitchen knives.

Harris County Assistant Medical Examiner Darshan R. Phatak testified that he performed an autopsy on the complainant's body and "[t]he cause of death was multiple sharp force injuries, and the manner of death is a homicide."

During the punishment phase of trial, two of the complainant and appellant's children, who were present during the stabbing, and the complainant's brother, Lauro Saldana, testified for the State. Appellant's counsel did not cross-examine the children and only asked Saldana whether he had a Texas driver's license, which the State objected to as irrelevant. No witnesses testified for the defense.

**\*2** After the trial court entered its judgment, appellant filed a motion for new trial, requesting a new punishment hearing. He argued that he received ineffective assistance of counsel during the punishment phase of trial because his trial counsel had failed to interview and call available mitigation witnesses in his defense. The trial court held an evidentiary hearing and received testimony from appellant's father, Enrique Gonzalez Cortez, appellant's sister-in-law, Nancy Barron, appellant's brother, Fernando Gonzalez ("Fernando"), and appellant's trial counsel, Paul Decuir. The trial court also admitted into evidence the affidavits of Barron and Fernando as well as nine other individuals.

At the hearing, Cortez testified that although he was present at trial and was willing to testify, no one spoke to him about testifying. He did not speak to Decuir prior to or during trial, and he was not aware of "whether or not [appellant had] told [his] attorney to call [him] as a witness." Cortez also testified as to appellant's childhood, education, and character.

Barron testified that she was present at trial, prepared to testify, and surprised that she did not testify. According to Barron, she was supposed to testify during the guilt phase of trial. She had hired Decuir for appellant and met with him three times to prepare to testify. And he had discussed the case with her. Although Barron had discussed with Decuir the complainant and appellant's relationship, "who [appellant] was as a person," and his background, she did not speak to

appellant about his wishes as to whether or not she would testify. Barron explained that appellant had treated her family well; would give advice to her children; was happy, generous, and had good credit; and would help people by working on their cars.

Fernando testified that he helped hire Decuir and met with him "to find out about the case" a total of "[a]bout ten" times, including "[t]wo or three" meetings "[i]n-person." Decuir did not interview Fernando "to find out what information [he] might have about [appellant] or the case," and he did not discuss testifying with Fernando. Fernando explained that he was present at trial and willing to testify. Although Decuir spoke to the family after the jury had returned its verdict of guilty, Fernando could only understand little of what was said due to a language barrier. Fernando stated that appellant was a mechanic; would help people using his skills and lend them cars; was generous, charitable, and non-violent growing up; and continued to pay his bills while incarcerated. He also explained that a conflict existed between the complainant and appellant, the complainant would always contradict appellant and act contrary to his wishes, and appellant was frustrated and displeased with the complainant's behavior.

Finally, Decuir testified that appellant's family contacted him to represent appellant, he spoke and met with the family members "[s]everal times," and he had had the most contact with Fernando and Barron. Decuir explained that he did his own investigative work in the case and "conduct[ed] an independent investigation based on [the] information [he had] available."

In preparation for the trial, Decuir "went out to the scene" and "visited with [appellant] on several occasions ... to get the names of witnesses." Although he "wanted to subpoena someone who would support [appellant's] position that he was a good worker ... [and] provider," appellant "wouldn't give" him such information because "[h]e didn't want ... to call witnesses." Even though appellant would not provide him with "the names of any witnesses for either the guilt/innocence or punishment stage," Decuir did not "cease investigat[ing]." As a preliminary matter, he looked into appellant's background and education and interviewed "several people," including "four or five family members," about appellant, but Decuir could not recall their names. "They gave [him] some information about [the marriage], where [the complainant and appellant] had lived, [and] the children...." Through his investigation, Decuir became aware of appellant's educational background, and the information

he received from family members indicated that appellant did not have any problems while growing up. Although he did not ask appellant specifically about his childhood during his investigation, Decuir did not find any evidence of physical or sexual abuse, a learning disability, below-average intelligence, addiction, or substance-abuse. Appellant had a "stable home environment" and "the support of both of his parents as he was growing up." Appellant did not live in poverty or lack basic necessities, such as food, shelter, or clothing. Decuir did not find any mitigation witnesses that would have been beneficial in the punishment phase of the trial.

**\*3** Decuir noted that he specifically spoke with Barron and Fernando about testifying as mitigation witnesses during the punishment phase, especially about appellant's good qualities. Barron agreed to testify, and Decuir believed that her testimony would not have been harmful, except that she would have to tell the truth about the "stormy relationship" between appellant and the complainant. Decuir noted that Barron and Fernando were "the only witness [es] that ... came forward," and appellant "would not give [Decuir] the names of any witnesses, period." Decuir did ask Barron whether she knew appellant's boss or other potential witnesses. He also spoke to Saldana, the complainant's brother, but believed that his testimony would have actually been harmful to appellant. And, although Decuir spoke with Cortez, appellant's father, he did not interview him to determine if he should testify during the punishment phase. Decuir knew Cortez was at the trial, but he did not speak with him about testifying after the guilt verdict because appellant "told [Decuir] he didn't want to call any witnesses." Decuir noted, thus, that he did not "anticipate having to call punishment witnesses ... other than Ms. Barron."

In his testimony, Decuir repeatedly emphasized that appellant did not want him to call any witnesses "to support his position." And appellant refused to give him "information and the names of witnesses to help [him] mount a defense" or "put witnesses on" to mitigate punishment. Decuir explained that he "had several conversations with [appellant] with regard to calling witnesses, just to talk to his good character, his work ethics, the support that he provided his family." However, appellant told him "[n]o witnesses" and that he "didn't want to have any witnesses." Appellant specifically "instructed" Decuir not to call witnesses and that he did not want his family members to testify. And appellant "would not let" Decuir call Barron to testify during the punishment phase of trial and told him, "No." Decuir spoke to appellant "extensively" about

"the importance of the punishment phase" and discussed "the benefit [Barron] or [Fernando] could provide if they testified [during] punishment," to which appellant responded "no witnesses." After the guilt phase of trial, appellant's main concern was to see whether the State's previous offer of confinement for fifty years was still available. After the prosecutor said that it was not, Decuir "conferenced with [appellant] and said, 'Listen, we need to get some witnesses to come up here,' " to which appellant responded, "No witnesses." And appellant also did not want to testify during the punishment phase of trial.

Following the evidentiary hearing, the trial court denied appellant's motion for new trial.

### Standard of Review

To prove a claim of ineffective assistance of counsel, appellant must show that (1) his trial counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington,* 466 U.S. 668, 687–88, 694, 104 S.Ct. 2052, 2064, 2068 (1984); *Lopez v. State,* 343 S.W.3d 137, 142 (Tex.Crim.App.2011). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. In reviewing counsel's performance, we look to the totality of the representation to determine the effectiveness of counsel, indulging a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance or trial strategy. *See Robertson v. State,* 187 S.W.3d 475, 482–83 (Tex.Crim.App.2006). Appellant has the burden of establishing both *Strickland* prongs by a preponderance of the evidence. *Jackson v. State,* 973 S.W.2d 954, 956 (Tex.Crim.App.1998). "An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong." *Williams v. State,* 301 S.W.3d 675, 687 (Tex.Crim.App.2009).

Appellant presented his ineffective-assistance claim to the trial court in a motion for new trial and received a hearing on his motion. We, therefore, analyze his issue under an abuse of discretion standard as a challenge to the denial of his motion. *Biagas v. State,* 177 S.W.3d 161, 170 (Tex.App.—Houston [1st Dist.] 2005, pet. ref'd). We view the evidence in the light most favorable to the trial court's ruling and uphold the trial court's ruling if it is within the zone of

reasonable disagreement. *Wead v. State,* 129 S.W.3d 126, 129 (Tex.Crim.App.2004). We do not substitute our judgment for that of the trial court, but rather decide whether the trial court's decision was arbitrary or unreasonable. *Webb v. State,* 232 S.W.3d 109, 112 (Tex.Crim.App.2007); *Biagas,* 177 S.W.3d at 170. If there are two permissible views of the evidence, the trial court's choice between them cannot be held to be clearly erroneous. *Riley v. State,* 378 S.W.3d 453, 457 (Tex.Crim.App.2012). A trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Webb,* 232 S.W.3d at 112.

**\*4** We note that trial courts are in the best position to "evaluate the credibility" of witnesses and resolve conflicts in evidence. *See Kober v. State,* 988 S.W.2d 230, 233 (Tex.Crim.App.1999). And a trial court may choose to believe or disbelieve all or any part of the witnesses' testimony. *See id.* at 234.

When, as here, the trial court makes no findings of fact regarding the denial of a motion for new trial, we should "impute implicit factual findings that support the trial judge's ultimate ruling on that motion when such implicit factual findings are both reasonable and supported in the record." *Johnson v. State,* 169 S.W.3d 223, 239 (Tex.Crim.App.2005); *Escobar v. State,* 227 S.W.3d 123, 127 (Tex.App.—Houston [1st Dist.] 2006, pet. ref'd).

## Ineffective Assistance of Counsel

In his sole issue, appellant argues that the trial court erred in denying his motion for new trial because Decuir "failed to conduct an adequate investigation and present mitigating evidence from witnesses who were available and willing to testify" during the punishment phase of his trial.

A criminal defense lawyer must have a firm command of the facts of a case to render reasonable effective assistance of counsel. *Ex parte Ybarra,* 629 S.W.2d 943, 946 (Tex.Crim.App.1982); *Ex parte Duffy,* 607 S.W.2d 507, 516 (Tex.Crim.App.1980). Thus, counsel has the responsibility to make an independent investigation of the facts of the case and seek out and interview potential witnesses. *Ex parte Duffy,* 607 S.W.2d at 517.

☐™In considering whether trial counsel conducted an adequate investigation for potential mitigating evidence,

we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence was reasonable. *Wiggins v. Smith,* 539 U.S. 510, 522–23, 123 S.Ct. 2527, 2536 (2003); *Goody v. State,* 433 S.W.3d 74, 80 (Tex.App. —Houston [1st Dist.] 2014, pet. ref'd). "While '*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence,' 'counsel can ... make a reasonable decision to forego presentation of mitigating evidence [only] after evaluating available testimony and determining that it would not be helpful.' " *Goody,* 433 S.W.3d at 80–81 (alterations in original) (quoting *Wiggins,* 539 U.S. at 533, 123 S.Ct. at 2541; *Milburn v. State,* 15 S.W.3d 267, 270– 71 (Tex.App.—Houston [14th Dist.] 2000, pet. ref'd)). An attorney's decision not to investigate or to limit the scope of the investigation is given a "heavy measure of deference" and assessed in light of all circumstances to determine whether reasonable professional judgment would support the decision. *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. However, a failure to uncover and present mitigating evidence cannot be justified when counsel has not conducted a thorough investigation of the defendant's background. *Shanklin v. State,* 190 S.W.3d 154, 164 (Tex.App.—Houston [1st Dist.] 2005, pet. dism'd).

In addition to establishing a deficiency in counsel's performance, the defendant must show that a reasonable probability exists that the jury's assessment of punishment would have been less severe in the absence of counsel's deficient performance. *Bazan v. State,* 403 S.W.3d 8, 13 (Tex.App.—Houston [1st Dist.] 2012, pet. ref'd). Our prejudice analysis turns on whether counsel's deficiency "made any difference to the outcome of the case." *Riley,* 378 S.W.3d at 458. It is not enough to show that trial counsel's errors had some "conceivable" effect on the outcome of the punishment assessed; the likelihood of a different result must be "substantial." *Harrington v. Richter,* 562 U.S. 86, ——, 131 S.Ct. 770, 787, 792 (2011). An appellate court will not reverse a conviction for ineffective assistance of counsel during the punishment phase of trial unless the defendant shows prejudice as a result of deficient attorney performance. *Rivera v. State,* 123 S.W.3d 21, 32 (Tex.App.—Houston [1st Dist.] 2003, pet. ref'd). In reviewing whether a defendant has satisfied this showing, we accord "almost total deference to a trial court's findings of historical fact as well as mixed questions of law and fact that turn on an evaluation of credibility and demeanor." *Riley,* 378 S.W.3d at 458.

**\*5** Appellant argues that his trial counsel's failure to conduct an investigation and present mitigation evidence during the

punishment phase of trial prejudiced him because "[t]here [w]as [a]mple [e]vidence of [his] [g]ood [c]haracter [f]rom [a]vailable [w]itnesses." He asserts that "[t]he members of [his] family who testified at the Motion for New Trial hearing described many good characteristics of ... [a]ppellant and gave information regarding his background." And "[t]he affidavits that were submitted by other family and friends ... likewise provided ample potentially mitigating evidence describing [his] positive qualities." According to appellant, "[i]t is reasonable to presume that had some quantum of mitigation evidence been produced by the defense, the jury would have returned a[ ] ... lower number."

During the punishment phase of trial, the sixteen-year-old son of the complainant and appellant recounted the events of the stabbing. He explained that when his grandmother came into his room and told him what was happening, she was "scared" and "in shock," which caused him to become "really nervous" and "start[ ] to panic almost." He felt "like, [his] mom, ... can't be dead." When he went into the bedroom, he saw the complainant on the floor in a puddle of blood. He told appellant to go outside and wait for the police because he did not want appellant around his brothers and grandmother, as he thought that appellant might "hurt" them. He noted that appellant did not try to resuscitate the complainant or stop her bleeding. Instead, his youngest brother tried to stop the bleeding with napkins. He then asked the jury not to be "merciful" on appellant, but instead "[t]o do justice."

Next, the fifteen-year old son of the complainant and appellant testified about the stabbing. When he ran into the complainant and appellant's room, he saw the complainant on the floor and appellant standing over her. Although he tried to help his youngest brother stop the complainant's bleeding, appellant did not try to resuscitate her or stop her bleeding. Appellant then told him and his brothers that it was their "fault ... that he [had] killed [the complainant]." He also requested that the jury not show "mercy" on appellant, but instead "do justice."

Saldana, the complainant's brother, testified that he is taking care of the three sons of the complainant and appellant. He noted that when he saw his nephews and their grandmother on the night of the stabbing "[t]hey were crying and they were scared." Although the children have "tried to be strong since then," "[t]hey miss their mother."

In support of appellant's motion for new trial, appellant's father, Cortez, appellant's sister-in-law, Barron, and

appellant's brother, Fernando, testified at the evidentiary hearing on his behalf.

Cortez testified that the family's economic situation, during appellant's childhood, was "[a] little critical." Appellant attended school through highschool and received technical training. He was not violent growing up or as an adult, was a good father, and had a good relationship with his family and the complainant. Cortez did not speak to an attorney or investigator prior to or during trial, but he was present in the courtroom during appellant's trial and willing to testify.

Barron testified that appellant always treated her family well, gave "advice" to her children, and was a "good uncle." He was "happy," "generous," had "good credit," and was a good person. Appellant planned to assist Barron and her husband, Fernando, with purchasing a home, and he helped people by working on their cars. She had no direct knowledge of a conflict in the complainant and appellant's relationship. Barron acknowledged that she was aware of the complainant's injuries, the children were present in the home at the time of the stabbing, and appellant "blamed the murder on his children." She could not explain appellant's behavior, but she believed it was "out of character." Barron noted that she was prepared to testify at trial and believed she was to testify during the guilt phase. [2]

**\*6** Fernando testified that appellant was a mechanic, who would use his skills "to help people." Appellant planned to assist Barron and Fernando with purchasing a home, was a "generous person," and would make contributions to "Children International." Appellant was non-violent growing up, made a "good living," and continued to pay his bills while imprisoned, including his son's car insurance premiums and the taxes due on the house where his children live. Fernando also stated that there was a "conflict" between the complainant and appellant, and he noted that the complainant would "always" contradict appellant and "act[ ] contrary to his wishes." Appellant had "express[ed] frustration" with the complainant's behavior, and he was "displeased that she would not follow his wishes." Although Fernando and appellant discussed this conflict "[s]everal" or "many" times, Fernando did not "personally observe" the conflict. He also noted that he was not interviewed by an attorney, but he was prepared and willing to testify at trial. [3]

The trial court also admitted into evidence at the hearing the affidavits of nine other individuals. Jose Hernandez testified that appellant, his son's godfather, is a "hard worker, very

calm, and peaceful." Hernandez "never saw him fight, or get mad at other people." He noted that appellant "is a person who fought to bring his family ahead and surpass. He always wanted his children to surpass in their studies and that his family and his wife would always be happy.... [H]e has always been respectful with everyone." Hernandez noted that he was not contacted by an attorney or investigator to testify on appellant's behalf, but would have done so.

Ismael A. Toledo Barron ("Ismael") testified that his wife is appellant's sister. He explained that appellant "is a peaceful person, well organized and [a] hard worker. He is a person that doesn't like problems and always wants the best for his children. He was always attentive to them and ... his wife." Ismael "never saw [appellant] fight or have a problem with anyone" and has "never known him of doing drugs, or being drunk." However, on "several occasions" he saw appellant "scold his children," and the complainant "did not like for him to scold them." Ismael noted that he was not contacted by an attorney or investigator about testifying at trial, but "[i]f there is another trial, [he is] willing to testify if necessary."

Jose Luis Sanchez Vazquez testified that he has known appellant since "adolescen[ce]," however, they "did not spend a lot of time together because [appellant] was a very busy person. He had a full time job and during his days off, he would ... do[ ] mechanic work ... to give his family a good future." Vazquez did not know appellant to be "a violent man or a drunk," and he noted that appellant was dedicated to his family. One time, appellant told Vazquez "that he was going to be a foster parent for Children's International, and that he had had problems with this wife because of that. And she wanted him to end that, but he stood firm, and he had to do this behind her back, so there would be no more problems." Vazquez noted that no one contacted him to inquire about appellant.

Gabriel Diaz testified that he saw the complainant and appellant three days before the stabbing, and he "did not see anything that seemed wrong." On other occasions, Diaz "never saw anything bad happening." He explained that appellant "would educate his children," "was never disrespectful," did not "miss treat[ ][sic]" the complainant, and would give Diaz "good advice." Diaz noted that he was not contacted by an attorney, but would have testified on appellant's behalf.

Alejandra Gonzalez ("Alejandra"), appellant's sister, testified that appellant "is a very responsible person," would "never

scream[ ]" at his siblings, and was "well groomed." She explained that appellant "wanted the children to be responsible" and "would put them to do [chores] around the house," but the complainant would not agree. She noted that appellant is a good brother, father, son, husband, and friend. She stated, however, that he was distant with many of his friends because the complainant "didn't want anyone to come over to the house." Alejandra "never saw [appellant] try[ ] to pick a fight with anyone," and he did not have problems with other people or law enforcement authorities. Alejandra noted that she was not contacted by an attorney, but was ready to testify for appellant.

**\*7** Juan Pablo Hernandez testified that he has known appellant for nineteen years and he is a "family man," a "hard worker," and a "good prideful person." "He was not a problematic person, [but] a very passive person and a good person." Hernandez noted that he was not contacted by an attorney or investigator, but would have testified on appellant's behalf.

Carolina Gonzalez ("Carolina"), appellant's cousin, testified that appellant is "a very peaceful, calm person," who "did not drink or have bad vices." He was "a lovable father to his children," "attentive to them," and "a good person." Carolina never saw appellant drink or fight with the complainant. And she explained that appellant "loved" his wife "very much" and did not have problems with law enforcement authorities. According to Gonzalez, the children "said lies." She noted that she was present at trial and would have testified for appellant, but she was not asked to do so.

Finally, Marie Diaz Sanchez and Ana Berta Gonzalez Diaz, appellant's mother and sister, testified that appellant "since an early age[,] always demonstrated good conduct." He "obtain[ed] good grades" and did not have "any problems" with his friends or teachers. They noted that appellant was "dedicated to" the complainant and "attentive" to her and their children, and he gave "good advice to his siblings and parents." Sanchez and Diaz noted that they would be "willing to answer any interrogations ... or testify on the case if necessary."

As it relates to appellant, the majority of mitigation evidence introduced by appellant during the hearing on his motion for new trial centered on the opinions of family and friends that he was a happy, generous, non-violent, and peaceful person. They all considered him to be a good person, husband, father, and friend. And the majority of the witnesses described

appellant's relationship with the complainant as conflict-free. We note, however, that much of this testimony contradicts appellant's own statement to law enforcement authorities, which was presented to and considered by the jury during the punishment phase of trial.

In his statement to Officer Sosa, appellant admitted that he and the complainant "ha[d] been having problems" and, on the night of the stabbing, they had talked about their "problems." They "began talking and ... became upset," and the complainant "blame[d] [him] for everything," noted that "everything was [his] fault," and told him that he "was wrong." Appellant explained that she was always "on" him, constantly contradicted him, and accused him of being "unfaithful" his "whole life." He noted that the complainant "was wrong," he was considering a divorce, and he "was going to leave his wife and get a house."

When asked about what had happened in the bedroom during the night of the stabbing, appellant responded that he "stabbed her," while she was "laying down," with knives that he had taken from the kitchen. According to appellant, "We argued, we got mad, and it happened. I stabbed her." He believed he stabbed her in her throat. Although the complainant "tr[ied] to defend herself," he "hit her with the knife. The devil got in [him]." Appellant could not explain why he stabbed her, just that "[i]t happened in that moment of anger." He also noted that he had previously "hit" the complainant when she would "challenge" him.

 **\*8** We note that when presented with contradictory evidence, trial courts are in the best position to "evaluate the credibility" of witnesses and resolve conflicts in the evidence. *See Kober,* 988 S.W.2d at 233. A trial court may choose to believe or disbelieve all or any part of the testimony of mitigation witnesses, especially testimony presented in affidavits and unsupported by live testimony. *Riley,* 378 S.W.3d at 457; *Kober,* 988 S.W.2d at 234. Further, a trial court is free to reject the credibility of new-trial evidence if it conflicts with evidence presented during trial. *See Goody,* 433 S.W.3d at 81 (holding defendant failed to show prejudice where trial court rejected credibility of evidence that conflicted with other evidence presented at punishment hearing).

Here, much of the evidence presented by appellant at the hearing on his motion for new trial directly contradicts appellant's own admissions. And the trial court, in denying appellant's motion for new trial, evidently rejected the

credibility of this new-trial evidence. We are cognizant that in analyzing the prejudice under *Strickland,* we must accord "almost total deference to a trial court's findings of historical fact as well as mixed questions of law and fact that turn on an evaluation of credibility and demeanor." *Riley,* 378 S.W.3d at 458.

Additionally, we note that some of appellant's mitigation evidence may not have benefitted him to the degree that he presumes, but instead actually highlights the conflict that existed between him and the complainant that he discussed in his statement to Officer Sosa. For instance, Fernando revealed in his testimony that he knew of a "conflict" between the complainant and appellant, and he noted that appellant was frustrated with the complainant's behavior and "displeased that she would not follow his wishes." Additionally, other witnesses discussed the complainant and appellant's disagreements and problems, which occurred prior to the stabbing. Such evidence, could have actually harmed appellant rather than mitigate his punishment. *See Ex parte McFarland,* 163 S.W.3d 743, 758 (Tex.Crim.App.2005) (holding defendant did not establish prejudice where he failed to show witness testimony would have benefitted him); *Bone v. State,* 77 S.W.3d 828, 834–35 (Tex.Crim.App.2002) (explaining potential benefit of additional testimony outweighed by risk of unfavorable counter-testimony); *Dillon v. State,* No. 12–06–00135–CR, 2007 WL 4216253, at \*7 (Tex.App.—Tyler Nov. 30, 2007, pet. ref'd) (mem. op., not designated for publication) (holding defendant failed to show reasonable probability of different result where "any benefits to be gained from the use of character witnesses ... would be offset if not supplanted by cross examination of those witnesses").

Further, as to the witnesses who did not mention any conflict between the complainant and appellant, but instead testified that the complainant and appellant had a good relationship and appellant had a peaceful, non-violent nature, the jury could have easily discredited such testimony given appellant's own admissions of his on-going marital problems and that he had previously "hit" the complainant.

We also note that appellant did not demonstrate at the motion for new trial hearing that all of his mitigation witnesses were available to testify at his trial. *See King v. State,* 649 S.W.2d 42, 44 (Tex.Crim.App.1983) ("Counsel's failure to call witnesses at the guilt-innocence and punishment stages is irrelevant absent a showing that such witnesses were available and appellant would benefit from their

testimony."). Specifically, four of appellant's witnesses did not state that they were available to testify at his trial, and appellant presented no other evidence of their availability. We, therefore, do not consider their testimony in determining prejudice. *See Ex parte McFarland,* 163 S.W.3d at 758 (holding defendant did not show prejudice where he failed to show witnesses available to testify); *cf. Milburn,* 15 S.W.3d at 269–71 (holding counsel's failure to investigate and present mitigating evidence during punishment prejudiced defendant where parties stipulated twenty witnesses would have testified as to their availability).

 **\*9** We further note that in regard to the testimony that appellant was organized, responsible, and a hard-worker, who "fought to bring his family ahead" and give them "a good future," it is also not likely that such evidence would have affected the punishment assessed, given the strength of the testimony of appellant's children and appellant's statement. *Cf. Alfaro v. State,* No. 01–13–0073–CR, 2014 WL 3606751, at \*6–7 (Tex.App.—Houston [1st Dist.] July 22, 2014, no pet.) (mem. op., not designated for publication) (concluding testimony defendant responsible and worked unlikely to affect punishment assessed in light of testimony of wife and children about extensive abuse); *Alvarado v. State,* No. 04–03–00289–CR, 2006 WL 332536, at \*9–10 (Tex.App. —San Antonio Feb. 15, 2006, pet. ref'd) (mem. op., not designated for publication) (denying defendant's ineffective-assistance claim where uncalled witnesses would have testified defendant responsible and hard worker); *Dotson v. State,* Nos. 14–98–00590–CR, 14–98–00591–CR, 1999 WL 1123037, at \*4 (Tex.App.—Houston [14th Dist.] Dec. 9, 1999, pet. ref'd) (not designated for publication) (holding second prong of *Strickland* not satisfied where uncalled witnesses would have testified defendant hard worker with steady job).

Given the foregoing, we are not persuaded that a reasonable jury would have imposed a less severe punishment had it been presented with appellant's mitigation evidence. *Bazan,* 403 S.W.3d at 13.

Finally, we note that appellant's reliance on our sister court's decision in *Milburn* is misplaced. In *Milburn,* the jury sentenced Milburn to confinement for forty years for possession with intent to deliver a controlled substance. 15 S.W.3d at 268. At the hearing on the motion for new trial, the parties stipulated to the testimony of twenty of Milburn's mitigation witnesses that "they had known [Milburn] for a long period of time, they were never contacted to testify by any member of [Milburn's] defense team, they would have testified had they been requested to, and they would have asked the jury to consider the minimum punishment." *Id.* at 269. And Milburn's counsel testified that he had failed to interview and call any witnesses during the punishment phase of trial. *Id.* at 270. Thus, because Milburn's trial counsel readily admitted that he neither investigated nor evaluated available punishment evidence, the appellate court held his performance deficient. *Id.*

In evaluating the second prong of the *Strickland* analysis, the appellate court noted that "[a]fter the State concluded its presentation of testimony and evidence to the jury showing [Milburn's] bad character, [Milburn's] trial counsel responded, 'We're not going to put anything on.' " *Id.* The jury then "returned a sentence in *excess* of that requested by the State." *Id.* The court concluded that Milburn had demonstrated prejudice in the case because his "trial counsel performed no investigation into any possible mitigating facts and failed to contact even a single family member or friend, despite the availability of such mitigation evidence .... [And] [t]his evidence would have provided some counterweight to evidence of bad character ... received by the jury." *Id.* at 270– 71 (internal citations omitted).

Appellant argues that "[a] similar result to *Milburn* is warranted in the present case" because "[t]here [is] ample evidence concerning ... [a]ppellant's good character that Decuir could have uncovered had he interviewed or contacted even a handful of the affiants." Contrary to appellant's assertion, however, *Milburn* is markedly dissimilar to the present case.

First, Milburn's trial counsel openly admitted that he did not investigate or interview any mitigation witnesses. *Id.* at 270. Here, however, appellant's trial counsel testified at the hearing on appellant's motion for new trial that he "conduct[ed] an independent investigation"; he looked into appellant's background and education; and he interviewed several family members about appellant's marriage, where the complainant and appellant had lived, and their children. Decuir specifically spoke to Barron and Fernando about testifying as mitigation witnesses, especially about appellant's good qualities. He also spoke with Saldana and tried to obtain the name of appellant's boss. Although Decuir's testimony was not completely uncontroverted, we are not presented with a situation, as in *Milburn,* where appellant's trial counsel readily admitted on the record at the new trial hearing that he did nothing to investigate the case.

**\*10** Second, the court in *Milburn* emphasized the fact that the jury, when not presented with any mitigation evidence, imposed a sentence greater than the one requested by the State. *Id.* at 270. In contrast, here, although the State, in its closing argument, requested that the jury "sentence [appellant] to life," the jury, instead, assessed appellant's punishment at confinement for fifty years.

Finally, here, unlike in *Milburn,* there is uncontroverted evidence that appellant specifically instructed his trial counsel not to present any witnesses to testify on his behalf during both the guilt and punishment phases of trial, including Barron, who counsel had prepared to testify. During the hearing on appellant's motion for new trial, Decuir testified that he wanted to call someone to testify that appellant was a good worker and provider, but appellant would not give him information and did not want him to call any witnesses. Further, appellant would not provide him with the "names of any witnesses for either the guilt/innocence or punishment stage." Although Decuir had "several conversations with [appellant] with regard to calling witnesses, just to talk to his good character, his work ethics, the support he provided for his family," appellant responded, "[n]o witnesses," and that he "didn't want to have any witnesses."

We have previously held that a defendant failed to establish prejudice under *Strickland* when he instructed his counsel to not present mitigation testimony, even when witnesses were present and available, and the defendant did not present any evidence at the new trial hearing "that, despite his earlier desire that trial counsel refrain from presenting additional mitigation evidence, he nonetheless would ... not have interfered with the mitigation testimony revealed at the new trial hearing." *Bazan,* 403 S.W.3d at 13–15; *see also Schriro v. Landrigan,* 550 U.S. 465, 475–77, 127 S.Ct. 1933, 1940–42 (2007) ("If [defendant] issued such an instruction [not to offer any mitigating evidence], counsel's failure to investigate further could not have been prejudicial under *Strickland.*"); *Ex parte Olvera,* No. 05–11–01349–CR, 2013 WL 4052467, at \*6 (Tex.App.—Dallas Aug. 12, 2013, pet. ref'd) (mem. op., not designated for publication) ("[W]hen a defendant instructs his attorney not to interview certain witnesses, the defendant may not later claim his attorney's investigation was ineffective."); *Oseguera–Garcia v. State,* No. 04–11–00896–

CR, 2013 WL 2368258, at \*5 (Tex.App.—San Antonio May 29, 2013, pet. ref'd) (mem. op., not designated for publication) (concluding trial counsel not ineffective for not investigating or presenting mitigation testimony where defendant "failed to provide any contact information or have the witnesses call [counsel]"); *Malek v. State,* Nos. 03–10–00534–CR, 03–10–00535–CR, 2012 WL 370551, at \*4–5 (Tex.App.—Austin Feb. 1, 2012, pet. ref'd) (mem. op., not designated for publication) (overruling defendant's ineffective-assistance claim for failing to call mitigating character witnesses where "record reflect[ed] that [he] did not want his friends or family members involved in the trial"); *Taylor v. State,* No. 01–06–00971–CR, 2008 WL 597271, at \*4 (Tex.App.—Houston [1st Dist.] Mar. 6, 2008, pet. ref'd) (mem. op., not designated for publication) (holding trial court did not abuse its discretion in concluding defendant did not meet his burden to establish ineffective assistance where defendant told counsel not to contact family members); *Hills v. State,* No. 14–02–00379–CR, 2003 WL 21402606, at \*2 (Tex.App.—Houston [14th Dist.] June 19, 2003, pet. ref'd) (mem. op., not designated for publication) (overruling defendant's ineffective-assistance claim for failure to investigate and call mitigation witnesses where defendant "had not wanted anyone to participate in his trial and ... refused to give his counsel the names of any witnesses who might assist him").

**\*11** In order to establish prejudice, appellant must show that a reasonable probability exists that the jury's assessment of punishment would have been less severe in the absence of counsel's deficient performance. *Bazan,* 403 S.W.3d at 13. Even if we presume that trial counsel's representation was deficient in this case, appellant has not shown a substantial likelihood of a different result. *Harrington,* 562 U.S. at ——, 131 S.Ct. at 787, 792. Accordingly, we hold that the trial court did not abuse its discretion in denying appellant's motion for new trial.

We overrule appellant's sole issue. [4]

### Conclusion

We affirm the judgment of the trial court.

Footnotes

1    *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 2011).

2      At the hearing, the trial court admitted into evidence Barron's affidavit in which she did not provide any additional information beyond her live testimony.

3      The trial court also admitted into evidence Fernando's affidavit in which he further explained the on-going conflict between the complainant and appellant.

4      We note that although not presented as an issue separate from his ineffective-assistance claim, appellant asserts that the trial court erred in denying his request for Decuir to turn over to him his client file. He invites the Court, if it "believes that ... [a]ppellant has not met his burden under *Strickland* ... as [the record] currently stands, but believes that the failure of the trial court to order Decuir to turn the file over constitutes error which must be rectified," to abate the appeal for a supplemental hearing on his motion for new trial. We decline to do so.

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.