

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NOS. WR-89,923-01, WR-89,923-02

### In re State of Texas ex rel. JOHN H. BEST, Relator

### PETITION FOR WRITS OF MANDAMUS AND PROHIBITION
### IN CAUSE NO. C-17-0982-SB IN THE 340TH JUDICIAL DISTRICT COURT
### TOM GREEN COUNTY

**YEARY, J., delivered the opinion for a unanimous Court.**

## O P I N I O N

This is a petition for the writs of mandamus and prohibition filed in this Court, seeking to overturn the order of a district court judge which requires the Texas Department of Public Safety ["DPS"] Crime Lab in Lubbock make an audiovisual record of DNA testing in certain cases. We will grant conditional relief.

## BACKGROUND

Relator is John H. Best, the District Attorney for the 119th Judicial District, and this case involves five codefendants (real parties in interest here) who have all been indicted for offenses arising out of the same criminal episode, a shooting that occurred "on or about the 21st day of July, 2017." Stephen Jennings, Kristen Jennings, and David Navarro were

all indicted for capital murder and lesser offenses. Garry Jennings was indicted for murder and lesser offenses. And Angella Wray was indicted for aggravated kidnapping and engaging in organized criminal activity. Relator asserts that the five cases were assigned to four district courts, with Stephen Jennings' and Kristen Jennings' cases assigned to Respondent's court, the 340th Judicial District Court. The State has not waived the death penalty in the three capital murder cases.

Pursuant to Texas Code of Criminal Procedure, Article 38.43, the State submitted biological evidence collected in these cases to the DPS Crime Lab in Lubbock for DNA testing. TEX. CODE CRIM. PROC. art. 38.43. However, Stephen Jennings and Navarro moved in their respective courts to have the DNA testing halted. They argued that some of the biological samples might not be sufficient for the State to conduct its DNA testing and for the five defendants to be able to retest the evidence. Respondent stayed the testing until an evidentiary hearing could be held, and he scheduled a hearing.

Navarro requested that the four trial courts agree on a single DNA testing policy. Navarro's judge, the Presiding Judge of the 51st Judicial District Court, signed an "Order to Halt DNA Testing until Further Order" that directed Relator to provide all five codefendants with notice of any hearings in any of the four courts related to the scientific testing of evidence collected in these cases.

In December 2018, Respondent held an evidentiary hearing in which one witness, DPS DNA Section Supervisor David Young, testified. Defendant Stephen Jennings' DNA expert, Dr. Elizabeth Johnson, was standing by on "Court Call" listening to Young's testimony.

Young testified that the DPS lab is periodically audited by various entities and accredited by a national board. Young conceded that some samples, like a swab used to collect touch DNA, can be completely "consumed" by the extraction process. Young said that DPS's quantification and amplification processes usually leave more than half of the fifty microliters of extract available for defense testing. But sometimes they must use another fifteen microliters of the extract, leaving an insufficient quantity of extract for a defendant to conduct independent testing. Young stated that DPS policy prohibits allowing non-employees (other than auditors) into the lab work area while they are testing the evidence. He said that DPS normally runs batch tests which might include samples from a number of cases. He testified that allowing non-employees into the work area or allowing electronic monitoring/recording would be "very disruptive," could make analysts anxious, and could create a risk of contamination or cause delays in multiple cases.

Respondent adjourned the hearing without taking additional testimony and ordered the parties to submit briefs. Stephen Jennings and Navarro filed briefs, Relator filed a "Brief in Opposition to Defense Request for Observation of State DNA Testing," and Stephen Jennings filed a reply to Relator's brief. With his briefing, Stephen Jennings submitted Johnson's two declarations discussing her qualifications, best practices for DNA testing, the proposed DNA testing of the biological samples in the instant case, her past experience with DPS labs and other crime labs, and her observations responsive to Young's testimony.

In February 2019, Respondent sent counsel for all five defendants a letter setting out his findings of fact and rulings regarding this matter. Respondent found that the State's proposed DNA testing would not provide enough remaining DNA sample or extract for

each of the five defendants to conduct their own confirmatory testing of the biological evidence. Respondent stated that Article 38.43(i) did not grant the State the absolute or exclusive right to select the DNA lab,[1] and Article 38.43(k) was not applicable here because no biological evidence had yet been "destroyed or lost."[2] Respondent found that the DPS lab was the only statutorily authorized option to conduct the testing because there was no evidence that any "private, accredited lab would willingly absorb the cost of DNA testing for another party." Respondent found the real parties in interest's constitutional and fundamental fairness arguments to be "well taken." Respondent further found that the State's and the real parties' concerns could be addressed by requiring DPS to allow "indirect or remote observation" of the DNA testing of the samples in question. Respondent directed Relator to work with the DPS lab to acquire the necessary equipment and to implement digital audiovisual recording of the handling, preparation, and testing of the

---

[1] Article 38.43(i) provides:

> Before a defendant is tried for a capital offense in which the state is seeking the death penalty, subject to Subsection (j), the state shall require either the Department of Public Safety through one of its laboratories or a laboratory accredited under Article 38.01 to perform DNA testing, in accordance with the laboratory's capabilities at the time the testing is performed, on any biological evidence that was collected as part of an investigation of the offense and is in the possession of the state. The laboratory that performs the DNA testing shall pay for all DNA testing performed in accordance with this subsection.

TEX. CODE CRIM. PROC. art. 38.43(i).

[2] Article 38.43(k) provides:

> If an item of biological evidence is destroyed or lost as a result of DNA testing performed under Subsection (i), the laboratory that tested the evidence must provide to the defendant any bench notes prepared by the laboratory that are related to the testing of the evidence and the results of that testing.

TEX. CODE CRIM. PROC. art. 38.43(k).

samples in question, using no fewer than three cameras to capture the entire DNA testing process.

In March 2019, Respondent signed an order providing that "any DNA testing conducted on the biological evidence in these cases be recorded by both audio and video." Respondent ordered Relator to submit a plan to Respondent for approval, with notice to all five defendants, "to ensure that the handling, preparation and testing of all of the biological material that will be consumed by testing (that evidence for which there is insufficient biological material for each defendant to conduct confirmatory testing) will be audio and video digitally recorded in such a manner as will capture the entire process and maintain a constant view of the biological evidence and the individuals involved in the DNA testing process." Respondent further ordered that no fewer than three cameras must be used and, "[t]he digital recording must be sufficient to record all comments and conversations that occur in the DPS crime lab during the DNA tests, in addition to any other sounds in the crime lab that are in any way relevant to the DNA tests." Respondent allowed each defendant seven days to object to the State's plan. Respondent stated that his ruling was "limited to this case, these defendants, and the circumstances before [Respondent]."

Relator filed a motion for reconsideration asking Respondent to withdraw his orders. Relator argued that Respondent had "no authority—constitutional, statutory, express, implied, inherent, or otherwise" to enter the orders. Relator also sent Respondent a letter asserting that "the State has no authority to order DPS to do anything." Relator further complained that the "changes to DPS's physical premises, testing procedures, and treatment of personnel contemplated by [Respondent] are massive." Relator estimated that

the process "could take a year or more." Stephen Jennings filed a response to Relator's motion for reconsideration. In April 2019, Respondent denied Relator's motion.

In May 2019, Relator filed in this Court the instant petition for writs of mandamus and prohibition and motion for leave to file the same. Relator argues that Respondent lacked the judicial authority to enter his orders, which contravene Article 38.43 and the Separation of Powers Doctrine. Relator maintains that Respondent's "primary justification for interfering with" the State's testing of the biological evidence "is essentially based on the idea that the real parties in interest have a constitutional right to discover and test untested biological material. They do not." Relator contends that, at best, Respondent's orders "represent a premature determination that the defenses of the real parties in interest will be impaired if they cannot each conduct testing on every original sample of biological material." Relator maintains that, because Respondent had no authority to execute these orders, he has a "ministerial duty to withdraw [the] stay and to refrain from enforcing [his] latest order or otherwise interfering with Relator's statutorily mandated testing of biological material." Relator asks this Court to grant his petition and order Respondent to: withdraw the order staying testing; withdraw the order requiring Relator to use DPS to perform testing and compelling DPS to utilize recording devices; and "refrain from further interference with Relator's testing of its evidence pursuant to statute." We granted Relator's motion for leave to file his petition and filed and set the cause for resolution by written opinion.

## *PADILLA*

In *Padilla v. McDaniel, Judge, 203rd Judicial District Court*, 122 S.W.3d 805, 808 (Tex. Crim. App. 2003), we held that "when a court of appeals and this court have

concurrent, original jurisdiction of a petition for a writ of mandamus against the judge of a district or county court, the petition should be presented first to the court of appeals unless there is a compelling reason not to do so." Relator has not sought extraordinary relief in the court of appeals. We agree with Relator, however, that there are compelling reasons not to have presented his petition of mandamus to the court of appeals. First, it is combined with a petition for writ of prohibition, over which the courts of appeals lack original jurisdiction other than to enforce their jurisdiction.[3] And second, several of the cases involved in this litigation are capital murder cases in which the State has not waived the death penalty. We agree it is appropriate to present the mandamus and prohibition matters first in this Court.

## THE STANDARD FOR EXTRAORDINARY RELIEF

To obtain extraordinary relief, Relator must show that 1) he has no adequate remedy at law, and 2) what he seeks to compel or prohibit is ministerial, involving no discretion. *State ex rel. Young v. Sixth Judicial Dist. Court of Appeals*, 236 S.W.3d 207, 210 (Tex. Crim. App. 2007) (mandamus); *In re McCann*, 422 S.W.3d 701, 704 (Tex. Crim. App. 2013) (prohibition). As to the second requirement, the Court has observed that, "[i]f a district judge enters an order for which he has no authority, mandamus will issue." *Cobb v. Godfrey*, 739 S.W.2d 47, 48 (Tex. Crim. App. 1987).

---

[3] This Court has original jurisdiction to issue both writs of mandamus and writs of prohibition. TEX. CONST. art. V, § 5(c); TEX. CODE CRIM. PROC. art. 4.04, § 1. The original jurisdiction of the courts of appeals extends to writs of mandamus against district court judges, but it extends to writs of prohibition only to the extent that such writs might be "necessary to enforce the jurisdiction of the court." TEX. CONST. art. V, § 6(a); TEX. GOV'T CODE § 22.221.

Relator has no ability to take an interlocutory appeal from the trial court's order in this matter pursuant to Article 44.01 of the Texas Code of Criminal Procedure. TEX. CODE CRIM. PROC. art. 44.01. He has no adequate remedy at law. We therefore proceed to address whether the act he seeks to compel or prohibit is ministerial—and specifically, whether it is within the trial court's authority to enter the order it did in these cases.

## THE TRIAL COURT'S AUTHORITY

We have said that Article 38.43—the statute at issue here—grants certain discretion in the trial court to regulate pre-trial DNA testing, by resolving disputes among the parties as to which "biological evidence" is necessary to be tested under that statute. *In re Solis-Gonzalez*, 489 S.W.3d 459, 461–62 (Tex. Crim. App. 2016). But whatever may be the permissible scope of a trial court's discretion over matters of pre-trial discovery, it does not extend to the point of ordering the State to create or generate evidence that does not otherwise exist. This Court has plainly said that a trial court does not have the authority to do *that*. In *In re Harris*, 491 S.W.3d 332, 336 (Tex. Crim. App. 2016), we declared that a trial court lacks authority to require the State, in the name of discovery, to "create a document that did not exist at the time of the discovery order."[4] Here, the trial court essentially ordered the State to generate documentary evidence, in the form of a digital

---

[4] In a footnote, the Court in *Harris* cited to its unpublished opinion in another extraordinary matter, *In re Stormer*, No. WR-66,865-01, 2007 WL 1783853, at *1 (Tex. Crim. App. June 20, 2007) (not designated for publication). *Harris*, 491 S.W.3d at 336 n.11. In *Stormer,* we observed: "While we defer to the trial judge's decision to deny a discovery request in the absence of a showing of good cause, we have not held that a trial judge lacks authority to order discovery in the absence of a showing of good cause. For that reason alone, this Court would not grant mandamus relief." 2007 WL 1783853, at *1. Nevertheless, we went on to grant qualified mandamus relief because the trial court purported to order the State to create certain documents that were not already in its possession. We observed that "[t]he trial court does not have authority under [TEX. CODE CRIM. PROC. art. 39.14] to order the State to create a document that it does not already have. Article 39.14 deals with the production of discovery materials, not their creation." *Id*., at *2.

audiovisual recording of DPS's DNA testing of the biological evidence, that would not exist but for the order itself. Such an order plainly exceeds the permissible scope of a trial court's discovery discretion.

## NO DUE PROCESS COMPULSION

What is more, we reject the trial court's conclusion that a failure to order a digital recording of the State's DNA testing in this case, or some other such documentary action, would result in a violation of the accused defendants' due process rights. That the State's DNA testing might exhaust the testable samples and thereby deprive the defendants of the ability to retest the biological evidence does not deprive them of their due process right to present a complete defense. Nor does it entitle them to discovery that would not otherwise be authorized.

"There is no general constitutional right to discovery in a criminal case," the United States Supreme Court has concluded, and "'the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded.'" *Weatherford v. Bursey*, 429 U.S. 545, 559 (1979) (quoting *Wardius v. Oregon*, 412 U.S. 470, 474 (1973)); *Ex parte Pruett*, 207 S.W.3d 767, 767 (Tex. Crim. App. 2005) (quoting *Weatherford*). And before evidence in the State's possession which may be destroyed during testing will be considered "material" for due process purposes, it "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984).

In these pre-trial discovery proceedings, prior to the DNA testing itself, it is not at all apparent that the biological evidence will have exculpatory value. Nor does it matter

that the State may be aware in advance that the testing might totally consume the biological evidence, such that re-testing by the defendants will be impossible. When evidence that the State destroys is only potentially exculpatory, due process is implicated only when the State has destroyed that evidence in bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988). And as this Court observed in *Ex parte Napper*, 322 S.W.3d 202, 232 (Tex. Crim. App. 2010): "If awareness that evidence would be destroyed were enough, by itself, to constitute bad faith, then officials could never conduct a test that would consume all of the evidence, even if doing so were necessary to achieve probative results."

Still, these defendants are not without recourse. We acknowledge that, should DPS's DNA testing generate only inculpatory results while at the same time totally consuming the biological samples, it may not be possible for the defendants to re-test the biological evidence. But Section (k) of Article 38.43 provides a remedy to defendants when the biological evidence is lost or destroyed as a result of DNA testing, namely: access to "any bench notes prepared by the laboratory that are related to the testing of the evidence and the results of that testing." TEX. CODE CRIM. PROC. art. 38.43(k). That access should allow defendants to subject any inculpatory DNA test results to the crucible of cross-examination.[5] Such a remedy at least minimally satisfies due process so long as the State has not destroyed the biological evidence in bad faith.

---

[5] Should the State be unable to provide any bench notes as required by Article 38.43(k), the defendants could present evidence of that inability at trial to impeach any inculpatory DNA test results. *Cf. United States v. Owens*, 484 U.S. 554, 559 (1988) ("If the ability to inquire into these matters suffices to establish the constitutionally requisite opportunity for cross-examination when a witness testifies as to his current belief, the basis for which he cannot recall, we see no reason why it should not suffice when the witness' past belief is introduced and he is unable to recollect the reason for that past belief. In both cases the foundation for the belief (current or past) cannot effectively be elicited, but other means of impugning the belief are available.").

**CONCLUSION**

We conclude that Respondent exceeded his discretionary authority in discovery matters by ordering the State to create evidence in the form of a digital audiovisual recording of DPS's DNA testing in these cases. As usual, a formal writ of mandamus and/or prohibition will not issue unless Respondent should fail to rescind its order and allow DPS to proceed with the DNA testing without memorialization beyond that contemplated by Article 38.43(k), *i.e.*, its bench notes.


DELIVERED:              February 3, 2021
PUBLISH